STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION; GAS RESEARCH INSTITUTE (Movant); PUBLIC SERVICE COMPANY OF NORTH CAROLINA, INC. (Intervenor); PIEDMONT NATURAL GAS COMPANY (Intervenor); NORTH CAROLINA NATURAL GAS CORPORATION (Intervenor); NUI NORTH CAROLINA GAS (Intervenor); FRONTIER ENERGY LLC (Intervenor); PUBLIC STAFF-NORTH CAROLINA UTILITIES COMMISSION (Intervenor); and MICHAEL F. EASLEY, ATTORNEY GENERAL (Intervenor), Appellees v. CAROLINA UTILITY CUSTOMERS ASSOCIATION, INC. (Intervenor), Appellant

No. COA00-8

(Filed 6 February 2001)

## 1. Appeal and Error— briefs—page limit—footnotes

Footnotes are not to be used as a means to avoid the page limitations specified in the appellate rules.

## 2. Utilities— appeal from Commission—standing—party aggrieved

The Carolina Utility Customers Association (CUCA) was without standing to appeal from a Utilities Commission order because it was not a party aggrieved where the order arose from a change by the Federal Energy Regulatory Commission which reduced the level of funding of the Gas Research Institute (GRI) by local distribution company (LDC) surcharges passed through to customers; GRI filed a motion that LDCs be authorized to make voluntary contributions and to recover those contributions in their annual rate adjustments; and the Commission concluded that LDCs would be allowed to record the contributions in a deferred charges account until the next rate case, at which the deferred charges balance would be amortized if the charges were found reasonable and prudent. This order only purports to establish a mechanism by which rates may be increased in the future;

128 IN THE COURT OF APPEALS

STATE ex rel. UTILS. COMM'N v. CAROLINA UTIL. CUSTOMERS ASS'N

[142 N.C. App. 127 (2001)]

the speculative recoupment by LDCs is recognized and, if an LDC opts not to voluntarily contribute to GRI, the issues presented by CUCA will not arise.

Appeal by Intervenor Carolina Utility Customers Association, Inc. from order entered 17 August 1999 by the North Carolina Utilities Commission. Heard in the Court of Appeals 8 January 2001.

*Chief Counsel Antoinette R. Wike, by Staff Attorney Vickie L. Moir, for intervenor-appellee Public Staff.*

*Attorney General Michael F. Easley, by Assistant Attorney General Margaret F. Force, for intervenor-appellee Office of Attorney General.*

*West Law Offices, P.C., by James P. West, for intervenor-appellant Carolina Utility Customers Association, Inc.*

SMITH, Judge.

Movant Gas Research Institute (GRI) is a non-profit organization that manages cooperative research and development programs in the natural gas industry. Prior to 1999, GRI was funded primarily by surcharges collected by interstate pipelines from natural gas local distribution companies (LDCs) pursuant to tariffs approved by the Federal Energy Regulatory Commission (FERC). The surcharges were, in turn, passed through to retail customers as part of the LDC's gas costs, pursuant to N.C. Gen. Stat. § 62-133.4 (1999).

In 1998, the FERC approved an agreement, which gradually reduced the level of GRI funding collected through surcharges and called for a complete elimination of funding through surcharges by 31 December 2004. In an effort to maintain its funding at the 1998 level, GRI proposed that LDCs around the country voluntarily contribute the difference between the 1998 equivalent funding level and the reduced surcharge level. In return for these voluntary contributions, the LDCs could designate the types of research they would support.

On 6 January 1999, GRI filed a motion with the North Carolina Utilities Commission (the Commission) "request[ing] the entry of an order authorizing LDCs in the state to make voluntary contributions to GRI for research and to recover such contributions in their annual Rate Adjustments pursuant to G.S. 62-133.4." GRI's proposal was presented to the Commission at its Regular Staff Conference on 25

January 1999. At the Conference, the Public Staff indicated that the proposal raised several important legal and policy issues, including "whether *voluntary* contributions to research (as opposed to mandatory contributions through interstate pipeline tariffs) are Gas Costs as provided in G.S. 62-133.4 and whether dollar for dollar rate recovery (as opposed to recovery as an O&M expense in basic rates) is warranted." Because of these concerns, "[t]he Public Staff recommended that the Commission issue an order requesting comments on GRI's proposal from interested parties and requesting GRI to describe in further detail how other state commissions have addressed the GRI funding issue." Accordingly, on 27 January 1999, the Commission issued an order requesting comments from any interested party and requesting GRI to detail how other states have broached the funding issue.

GRI responded as requested and proposed allowing LDCs to recover their voluntary contributions in their annual gas cost adjustment proceeding rather than as an O&M expense. Filing comments were intervenor-appellant Carolina Utility Customers Association, Inc. (CUCA); intervenor-LDCs Public Service Company of North Carolina, Inc. (PSNC), Piedmont Natural Gas Company (Piedmont), North Carolina Natural Gas Corporation (NCNG), NUI North Carolina Gas (NUI), and Frontier Energy LLC (Frontier); the Public Staff of the Commission; and the Office of Attorney General. In addition to the proposal suggested by GRI, other proposals submitted to the Commission were:

1. Adopting a surcharge mechanism to enable the LDCs to recover voluntary GRI contributions.

2. Denying GRI's motion and making no provision for LDC recovery of voluntary GRI contributions.

3. Approving a transitional accounting mechanism that would allow each LDC to record its voluntary GRI contributions in a deferred account until its next general rate case, at which time the Commission would examine the prudence and reasonableness of the contributions and take these contributions into account when calculating rates for consumers.

After considering the comments and reply comments of all interested parties, the Commission, on 17 August 1999, issued an order wherein it concluded in pertinent part:

STATE ex rel. UTILS. COMM'N v. CAROLINA UTIL. CUSTOMERS ASS'N

[142 N.C. App. 127 (2001)]

GRI is not a supplier of gas, and voluntary contributions to GRI are not costs "related to the purchase and transportation of natural gas to the [LDC's] system." Therefore, such contributions do not come within the scope of gas cost adjustment proceedings now, and G.S. 62-133.4(e) cannot be used to expand the definition of gas costs to cover such contributions. The Commission concludes that voluntary contributions made by the LDCs to GRI cannot be considered gas costs recoverable under G.S. 62-133.4.

. . . .

The Commission agrees that it has the authority to change rates in a rulemaking proceeding in certain limited circumstances. The question is whether such an approach is appropriate here. The Commission is not persuaded that it is appropriate to establish a surcharge or flow-through mechanism for GRI contributions in a rulemaking proceeding. . . . Given that customer mixes are not uniform and that different LDCs are on record as wanting to invest their GRI research dollars in different ways, the Commission cannot conclude that a generic solution is appropriate herein. Moreover, . . . all cost and revenue changes should be considered together in the context of a general rate case . . . . The Commission concludes that it must exercise its authority to change rates in a rulemaking proceeding only in limited circumstances and that such an approach is not appropriate here.

CUCA, the Attorney General and the Public Staff all state that any voluntary GRI contributions should properly be classified as O&M expenses and recovered through general rate case proceedings. However, given the unique circumstances of the situation, the Public Staff proposes that the Commission approve a special accounting treatment as a transitional recovery mechanism to bridge the change from FERC-approved gas costs to normal O&M expenses. The Public Staff proposes to allow each LDC to record voluntary contributions made to GRI through December 31, 2004 or the next rate case, whichever is earlier, in a deferred charges account. At the time of each LDC's next rate case, GRI costs would be recoverable to the extent they are found to be reasonable and prudently incurred. The balance in the deferred charges account would be amortized. As a condition of recovery, each LDC should be required to maintain adequate documentation that supports the prudence of its overall contributions. The documentation should include specifics regarding benefits received as the

result of participating in GRI research. The Public Staff contends that, with deferred accounting treatment, the LDCs would be allowed "a reasonable opportunity to collect amounts paid to GRI."

. . . .

The Commission's interpretation of the Public Staff's proposal is as follows: As FERC-approved surcharges decrease, we assume that each LDC will make some level of voluntary contributions to GRI. The LDC will be allowed to record the voluntary contributions made until December 31, 2004 or until the time of the LDC's next rate case in a deferred charges account; such deferrals will end on December 31, 2004 or at the time of the LDC's next rate case, whichever is earlier. In the LDC's next rate case, whenever it occurs, a reasonable ongoing level of GRI funding—whether through FERC-approved surcharges being recovered as gas costs or voluntary contributions of the LDC—will be treated as O&M expenses in the rate case and reflected in rates. The deferred charges account balance, if found reasonable and prudent, will be amortized in this rate case. The Commission recognizes that if these procedures require that FERC-approved surcharges collected under the interstate pipelines' tariffs be reclassified as O&M expenses in the rate case, an appropriate adjustment would have to be made in the LDC's gas cost accounts to prevent the double-collection of the surcharges in the gas cost adjustment proceedings. The Commission also recognizes that it has no authority to rule that a surcharge approved by the FERC is unreasonable or imprudently incurred and, therefore, surcharges collected through FERC-approved tariffs but reclassified from gas costs to O&M expenses in the rate case would not be subject to Commission prudency review. The Commission believes that these procedures will allow recovery of an LDC's reasonable and prudent funding of GRI and will protect the LDC from a shortfall in recovery during the transition as FERC-approved surcharges decrease and voluntary contributions increase. Furthermore, allowance of carrying charges on the amount in the deferred charges account will make the LDC whole for the delay in recovery. The Commission concludes that the ratemaking procedures described above should be followed in each LDC's next general rate case in order to effect the transition from FERC-approved funding of GRI to funding by voluntary contributions of the LDCs.

. . . .

STATE ex rel. UTILS. COMM'N v. CAROLINA UTIL. CUSTOMERS ASS'N

[142 N.C. App. 127 (2001)]

> After carefully considering all of the filings in this docket, the Commission concludes that the Public Staff's proposal as described above is reasonable and should be adopted. The Commission further concludes that the facts and arguments in this docket do not warrant either treatment of voluntary contributions to GRI through gas cost adjustment proceedings or the establishment of a surcharge for GRI funding through a rulemaking proceeding.

(Alteration in original.)

On 15 September 1999, Piedmont filed a motion for reconsideration and/or clarification, contending that the August order "place[d] significant risks on the LDCs" in that "the Commission could upon a hindsight review determine that some or all of GRI's expenditures are imprudent and that the contributions by the LDCs should not be recovered." Accordingly, Piedmont

> request[ed] the Commission to reconsider its August 17, 1999 Order and to approve a continuation of GRI contributions at the current levels pending each LDC's next general rate case, with all such contribution to be deferred in the manner set forth in the Commission's order but without the risk of disallowance upon an after-the-fact review.

Also on 15 September, CUCA filed a notice of appeal and exceptions from the August order.

On 6 October 1999, NCNG filed a motion for reconsideration and/or clarification stating in pertinent part:

> NCNG does not object to a procedure in which the Commission approves a level of GRI contributions for each LDC in a general rate case, although NCNG believes that the preferable way to fund GRI contributions is through a surcharge. Also, NCNG does not object to a procedure in which the Commission reserves the right to require NCNG to discontinue future contributions to GRI if the Commission determines that future contributions would not be prudent. In neither case, however, should NCNG be subject to the risk of retroactive disallowance of its contributions based on hindsight review of the utilization of the contributions to GRI.

Accordingly, NCNG

IN THE COURT OF APPEALS 133

STATE ex rel. UTILS. COMM'N v. CAROLINA UTIL. CUSTOMERS ASS'N

[142 N.C. App. 127 (2001)]

request[ed] that the Commission reconsider its August 17, 1999 Order and approve a continuation of GRI contributions at the current levels pending each LDC's next general rate case, with all such contributions to be deferred in the manner set forth in the Commission's Order but without the risk of subsequent disallowance.

On 7 October 1999, PSNC filed a statement in support of Piedmont's motion, stating that "PSNC should not be asked to incur the risk that some portion of its voluntary contributions to GRI will be disallowed in a subsequent general rate case. If PSNC is subject to a potential disallowance in a subsequent general rate case, PSNC probably will not make any voluntary contributions to GRI."

On 14 October 1999, the Commission issued an Order on Motions for Reconsideration and on Exceptions. In this subsequent order, the Commission concluded in pertinent part:

G.S. 62-90(c) provides that when a party files notice of appeal and exceptions as to a Commission order, the Commission may set the exceptions upon which the appeal is based for further hearing. Further, G.S. 62-80 provides that the Commission may reconsider any prior order. While these statutes provide some basis upon which the Commission could consider either the motions for reconsideration or the exceptions filed herein, the Commission concludes that (except as noted hereinafter) the Commission will take no action on CUCA's exceptions and that the Commission will not reconsider the August 17 Order.

. . . .

As to the exceptions filed by CUCA, one exception notes that the August 17 Order uses the phrase "there is much evidence that . . ." and correctly points out that the Commission did not hold an evidentiary hearing. It is clear from the complete sentence being quoted, in context, that the phrase was inadvertent and should have instead read "there were written comments that . . ." [sic] The Commission will take no action on CUCA's exceptions and its appeal may proceed.

On 5 November 1999, the Public Staff filed a motion for reconsideration stating in pertinent part:

Throughout this proceeding, the Public Staff has sought to support reasonable and prudent LDC expenditures for gas research

in a way that is consistent with the Commission's statutory authority and traditional ratemaking principles. We continue to believe that the deferral mechanism adopted by the Commission is theoretically the most appropriate way of providing support until the LDC's next general rate cases. We recognize, however, that . . . LDCs in general are unwilling to put any material sums at risk for contributions to GRI. Thus, it appears that the deferral mechanism may prove unworkable in practice.

[] After studying the matter further, the Public Staff believes there is merit to the suggestion of some of the LDCs that the Commission establish a procedure for prior approval of their voluntary contributions to GRI, so that they do not face the possibility of hindsight review and disallowance of deferrals in their next general rate cases. The burden of justifying these expenditures would remain with the LDCs, but they would have the benefit of certainty as to the ultimate ratemaking treatment of approved amounts. . . .

Therefore, the Public Staff requests the Commission to reconsider its prior Orders in this matter and seek further comments on whether a prior approval procedure would satisfy the LDCs' concerns about using the deferral mechanism for voluntary contributions to GRI and, if so, how such a procedure should be implemented. If the LDCs are unwilling to use the deferral mechanism even with the assurance of prior approval, then the Public Staff requests the Commission to consider rescinding its August 17, 1999, Order.

Following responses by CUCA and NCNG to Public Staff's motion, the Commission again issued an order, on 20 December 1999, stating that while the Commission "continue[d] to believe that the August 17 Order [was] well-reasoned and fair and should stand as issued[,]" it would "respond to certain concerns expressed by the LDCs by way of clarification, not reconsideration." The Commission stated that "[n]othing in [its] August 17 Order, including the provisions for documentation of overall GRI contributions, should be interpreted as allowing for hindsight analysis of the prudence of GRI contributions." Rather, the Commission will use a reasonableness standard to determine the prudence of GRI contributions. The Commission stated further, "The Commission-approved procedures are based on the ratemaking principles established by the General Statutes. The General Statutes do not provide for 'pre-approval' of rate case

expenses and the LDCs make expenditures every day without the Commission's 'pre-approval.' " Accordingly, the Commission refused to reconsider or rescind its prior 17 August 1999 order.

[1] On 3 January 2000, CUCA filed the record on appeal with this Court and thereafter filed its brief as appellant in this appeal. We are compelled to note CUCA's apparent attempt to circumvent the page limitations set forth in our Rules of Appellate Procedure. *See* N.C. R. App. P. 28(j) (setting 35-page limitations on principal briefs and 15-page limitations on reply briefs). While the text itself extends only to thirty-four pages, CUCA's abundant use of footnotes, the text of which contains much of the analysis necessary to sustain its arguments and consists of extraordinarily small type and single-spaced lines, demonstrates its noncompliance with our rules. If the text of the footnotes complied with the mandates of our rules and was added to the length of the brief, CUCA's appellate brief would have substantially exceeded the thirty-five page limit. *See, e.g., In re MacIntyre*, 181 B.R. 420, 421 (B.A.P. 9th Cir. 1995) ("Had [appellant] used the correct type size for the footnotes . . . , he would have undoubtedly exceeded the thirty page limit by several pages. It is also worth noting that [appellant's] use of footnotes is excessive and attempts to squeeze additional argument into his brief by utilizing the single spacing found in footnotes."); *In re Estate of Marks*, 595 N.E.2d 717, 721 (Ill. App. Ct. 1992) ("[T]he 'footnote' approach to getting around the page limitations is a violation of the spirit, and probably of the letter, of the law and is not favored . . . ."). Similarly, CUCA's reply brief, which spans better than fourteen pages, is strewn with approximately fifty lines of reduced-type text, thus adding additional pages to its brief. This is unacceptable and subjects CUCA's appeal to dismissal. *See Howell v. Morton*, 131 N.C. App. 626, 629, 508 S.E.2d 804, 806 (1998). Nevertheless, we elect pursuant to N.C. R. App. P. 2 to consider this appeal. However, we caution counsel that footnotes are not to be used as a means to avoid the page limitations specified in the appellate rules. *See* N.C. R. App. P. 28(j).

[2] While CUCA raises several issues for our consideration on appeal, we need not reach those issues because we hold that CUCA is not a party aggrieved by the order currently before us and, thus, has no standing to appeal from this order. To appeal from an order of the Commission, "the *party aggrieved* by such decision or order shall file with the Commission notice of appeal and exceptions" within thirty days after entry. N.C. Gen. Stat. § 62-90 (1999) (emphasis added).

We find guidance in this Court's decision in *State ex rel. Utilities Comm. v. Carolina Utility Cust. Assn.*, 104 N.C. App. 216, 408 S.E.2d 876 (1991). In that case, the Utilities Commission had amended a ratemaking formula previously considered and approved by the Commission in a general rate case. The amendment allowed Piedmont to reduce its rates *provided* that it could "remove the cost reduction if and when its gas costs later increased." *Id.* at 217, 408 S.E.2d at 876. CUCA contended it was an aggrieved party "because the order would allow Piedmont to increase its rates in the future to the extent necessary to offset previous reductions under this order." *Id.* at 218, 408 S.E.2d at 877. We disagreed, stating that "[w]hile under this order Piedmont may file, and in fact has filed to make subsequent increases, those proposed increases are not before us." *Id.* at 218, 408 S.E.2d 877-78.

Similarly, in the case *sub judice*, the Commission has authorized no change (increase or decrease) in rates. In fact, it specifically held that, while it "agree[d] that it ha[d] [the] authority to change rates in a rulemaking proceeding in certain limited circumstances[,] . . . [it] [was] not persuaded that it [was] appropriate to establish a surcharge or flow-through mechanism for GRI contributions in a rulemaking proceeding." The Commission specifically accepted the Attorney General's argument "that all cost and revenue changes should be considered together in the context of a general rate case" and concluded that the "exercise [of] its authority to change rates in a rulemaking proceeding . . . [was] not appropriate."

All the August 1999 order purports to do is establish a mechanism by which rates *may be* increased in the future. This speculative recoupment by the LDCs was recognized, as is unequivocally stated in a post-order statement made by PSNC: "If PSNC is subject to a potential disallowance in a subsequent general rate case, PSNC probably will not make any voluntary contributions to GRI." If an LDC opts not to voluntarily contribute to GRI, this transitional funding mechanism will be of no consequence and the issues now presented by CUCA will not arise. Accordingly, because the Commission's order did not impact rates and because any rate increases will be effectuated at subsequent rate cases, CUCA is not an "aggrieved party" and, thus, lacks standing to appeal.

Appeal dismissed.

Chief Judge EAGLES and Judge HUDSON concur.