STATE EX REL. UTILS. COMM'N v. CAROLINA POWER & LIGHT CO.

[359 N.C. 516 (2005)]

STATE OF NORTH CAROLINA *EX REL.* UTILITIES COMMISSION, PUBLIC STAFF—NORTH CAROLINA UTILITIES COMMISSION, ATTORNEY GENERAL, ROY COOPER, CAROLINA UTILITY CUSTOMERS ASSOCIATION, INC., CAROLINA INDUSTRIAL GROUPS FOR FAIR UTILITY RATES I AND II, VIRGINIA ELECTRIC AND POWER COMPANY D/B/A DOMINION NORTH CAROLINA POWER, NORTH CAROLINA MUNICIPAL POWER AGENCY NUMBER 1, AND NORTH CAROLINA EASTERN MUNICIPAL POWER AGENCY, INC. v. CAROLINA POWER & LIGHT COMPANY, DUKE POWER COMPANY, AND NORTH CAROLINA ELECTRIC MEMBERSHIP CORPORATION

No. 649A03

(Filed 1 July 2005)

**Utilities— sales of electricity to wholesale customers—doctrine of preemption**

The Court of Appeals erred by concluding that federal law has preempted the authority of the North Carolina Utilities Commission (NCUC) over proposed contracts involving sales of electricity by North Carolina utilities to wholesale customers in interstate commerce and NCUC has authority to conduct a pre-sale review of a utility's proposed grant of native load priority to a wholesale customer that will be supplied from the same generating plants as retail customers, because: (1) while Congress granted the Federal Energy Regulatory Commission (FERC) exclusive jurisdiction over wholesale sale of electricity in interstate commerce, it nevertheless intended that the states and their utilities commissions retain their traditional authority over generating facilities and local supply adequacy and reliability; (2) the review authority that NCUC possesses is necessary to enable it to fulfill its obligation under the North Carolina Public Utilities Act by ensuring that a regulated public utility has sufficient generating resources to provide reliable and adequate service to its captive retail ratepayers; and (3) NCUC's pre-sale review of the proposed grants of native load priority does not make compliance with both federal and state regulations a physically impossibility nor does it stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the Federal Power Act since the scope of NCUC's review does not include the authority to inquire into the prudence and fairness of a proposed contract or the power to overrule FERC.

Justice MARTIN dissenting.

Justice BRADY joining in the dissenting opinion.

**STATE EX REL. UTILS. COMM'N v. CAROLINA POWER & LIGHT CO.**

[359 N.C. 516 (2005)]

Justice NEWBY did not participate in the consideration or decision of this case.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 161 N.C. App. 199, 588 S.E.2d 77 (2003), vacating orders entered 10 July 2002 by the Utilities Commission, Docket No. E-100, Sub 85A, in Raleigh, North Carolina, and dismissing the proceeding with prejudice. Heard in the Supreme Court 11 May 2004.

*Roy Cooper, Attorney General, by Leonard G. Green, Assistant Attorney General, for appellant Attorney General.*

*Robert P. Gruber, Executive Director, and Antoinette R. Wike, Chief Counsel, by Gisele L. Rankin, Staff Attorney, for appellant Public Staff—North Carolina Utilities Commission.*

*West Law Offices, P.C., by James P. West, for appellant Carolina Utility Customers Association, Inc.*

*Bailey & Dixon, L.L.P., by Ralph McDonald, for appellant Carolina Industrial Group for Fair Utility Rates II.*

*Hunton & Williams, by Edward S. Finley, Jr., for appellees Carolina Power & Light Company, Duke Power Company, and intervenor North Carolina Electric Membership Corporation; Len S. Anthony for appellee Progress Energy (formerly, Carolina Power & Light Company); Kodwo Ghartey-Tagoe for appellee Duke Power Company; and Robert B. Schwentker and Thomas K. Austin for intervenor-appellee North Carolina Electric Membership Corporation.*

*Poyner & Spruill LLP, by Michael S. Colo, Thomas R. West, and Pamela A. Scott, for intervenor-appellees North Carolina Municipal Power Agency Number 1 and North Carolina Eastern Municipal Power Agency, Inc.*

*Steptoe & Johnson LLP, by Steven J. Ross, on behalf of Edison Electric Institute, amicus curiae.*

EDMUNDS, Justice.

In this matter, we consider the extent to which federal law has preempted the authority of the North Carolina Utilities Commission over proposed contracts involving sales of electricity by North Carolina utilities to wholesale customers in interstate commerce.

STATE EX REL. UTILS. COMM'N v. CAROLINA POWER & LIGHT CO.

[359 N.C. 516 (2005)]

Because we hold that the power to review such proposed contracts is consistent with the duties imposed upon the Utilities Commission by our General Assembly and is not preempted by federal law, we reverse the holding of the North Carolina Court of Appeals.

On 17 November 1998, Carolina Power & Light Company (CP&L) applied to the North Carolina Utilities Commission (NCUC) for permission to construct additional generating capacity in Rowan and Richmond Counties. The application, filed pursuant to N.C.G.S. § 62-110.1, was given Docket Number E-2, Sub 733. Related documents indicate that CP&L sought to construct new generating plants both because it anticipated increased demand arising from normal load growth and because it intended to enter into contracts to sell electric power to two wholesale customers, the South Carolina Public Service Authority (also known as Santee Cooper) and the North Carolina Electric Membership Corporation (NCEMC), outside the service area in which CP&L sold electricity to retail customers. As a public utility, CP&L is required to secure and maintain adequate resources to meet anticipated demands for electricity in its assigned service area. The contracts provided that CP&L would guarantee service reliability to these new wholesale customers at "native load priority." A grant of native load priority would ensure that the new wholesale customers would receive power at the same level of reliability as CP&L's existing retail customers. Under this proposed arrangement, in the event of a power shortage, CP&L would not interrupt the energy supply to the wholesale customers any sooner than it would interrupt the supply to its retail customers.

Evidence obtained during the Docket No. E-2, Sub 733 proceeding revealed that in 1998, CP&L initially had indicated that it planned to add 1,500 megawatt (MW) capacity to its facilities in the 2002-2007 period. However, CP&L now planned to accelerate the construction and also increase its capacity to 1,600 MW in the 2001-2002 period. Additional evidence indicated that CP&L's demand and energy forecasts showed that, unless the requested 1,600 MW capacity was added to its system, CP&L's capacity margin would fall to a level of negative 1.4 percent by the summer of 2003, thus preventing it from being able to provide reliable service to meet the needs of its customers, including the proposed new wholesale customers. CP&L's reliability analysis showed a target capacity margin of thirteen percent would be appropriate to allow it to have sufficient capacity to meet the needs of all its customers.

On 2 November 1999, NCUC issued an order granting the requested certificates for construction of two new power facilities. The order contained additional provisions that "CP&L shall fully consider the wholesale market for future generation resource additions that will be used in whole or in part to serve retail customers whether by formal RFP [requests for proposals] or other measures that ensure a complete evaluation of the market" and that "CP&L shall ensure that its retail electric customers will not be disadvantaged in any manner, either from a quality of service or rate perspective, as a result of its participation in the wholesale power market."

In response to the issues raised by CP&L's request in Docket No. E-2, Sub 733, and because no Commission rules or guidelines existed to address situations in which "(1) a utility desires to enter into a contract to serve off-system load at native load priority and/or (2) a utility . . . seeks a certificate to construct generation capacity to serve such off-system load[,]" the Public Staff requested that NCUC initiate a generic proceeding to address similar future situations that were likely to arise in the developing wholesale market. Accordingly, NCUC initiated Docket No. E-100, Sub 85 by order dated 17 November 1999. After twelve parties submitted comments, on 26 April 2000 NCUC concluded that the Docket No. E-100, Sub 85 proceeding "should be held in abeyance pending resolution of electric industry restructuring issues by the legislature or until some future event warrant[ed] further consideration of the issues."

On 22 August 2000, NCUC issued an order in Docket No. E-2, Sub 760, a proceeding that concerned a proposed merger of CP&L and Florida Progress Corporation. This order approved the merger and a concomitant issuance of securities but included several conditions. Of these, Regulatory Condition 21 provided

> CP&L shall not enter into contracts for the sale of energy and/or capacity at native load priority and/or under such terms and conditions as to cause the purchasing entity to fall within the definition of "native load" in the Integration Agreement without first giving the NCUC and the Public Staff written notice 20 days in advance of such a contract being executed.

NCUC's justification for imposing this notice obligation was to provide a mechanism through which NCUC meaningfully could enforce the requirement "that CP&L's retail native load customers receive priority with respect to, and the benefits from, CP&L's existing generation and that CP&L's wholesale activities not disadvantage its retail

STATE ex rel. UTILS. COMM'N v. CAROLINA POWER &·LIGHT CO.

[359 N.C. 516 (2005)]

ratepayers from either a quality of service or rate perspective." Because this proceeding was not generic, the notice provision applied only to CP&L.

CP&L did not resist the imposition of this provision. However, after the order approving the merger of CP&L and Florida Progress Corporation was issued, the Public Staff, CP&L, and NCEMC filed a motion requesting that NCUC amend the order to include Regulatory Condition 20a. This proposed modification provided that if CP&L complied with the twenty-day notice requirement in Regulatory Condition 21 and NCUC did not affirmatively order CP&L not to enter into such wholesale contracts, then "the retail native loads of these wholesale buyers that are served pursuant to said future contracts between those wholesale buyers and CP&L also shall be considered CP&L's retail native load for purposes of Conditions 19 and 20" of the order. NCUC accepted new Condition 20a by order dated 8 November 2000, amending its 22 August 2000 order.

Thereafter, pursuant to Regulatory Condition 21, on 31 January 2002, CP&L filed in Docket No. E-2, Sub 798 a twenty-day notice of intent to enter into two wholesale contracts for the sale of electricity at native load priority. When objections were raised, CP&L argued that while NCUC "retains authority to address retail rates and cost allocation issues, the Federal Power Act authorizes the Federal Energy Regulatory Commission (FERC) to regulate interstate wholesale electric power transactions" and that "FERC's authority over such transactions is exclusive 'and is not shared with state regulatory agencies.'" NCUC authorized CP&L to go ahead with the proposed contracts by order dated 26 February 2002.

The substantive and jurisdictional issues raised in Docket No. E-2, Sub 798 prompted NCUC to initiate on 11 March 2002 a new proceeding, Docket No. E-100, Sub 85A, for the purpose of investigating, *inter alia*, NCUC's jurisdiction with respect to wholesale contracts at native load priority and the extent to which that jurisdiction either complements or conflicts with FERC's jurisdiction in that field; the extent to which NCUC's jurisdiction is preempted once a wholesale contract at native load priority is signed; and what action NCUC could undertake to protect retail ratepayers as to retail rates and reliability. After receiving briefs from interested parties, NCUC concluded in an order entered in Docket No. E-100, Sub 85A dated 10 July 2002 that "it has jurisdiction and authority under State law to review, before they are signed, proposed wholesale contracts by a regulated North Carolina public utility granting native load priority to

be supplied from the same plant as retail ratepayers." NCUC further concluded that it has authority "to take appropriate action if necessary to secure and protect reliable service to retail customers in North Carolina." In addition, NCUC determined that this jurisdiction and authority is not preempted by federal law.

Shortly thereafter, CP&L, Duke Power, and NCEMC filed a motion asking NCUC "to reconsider and clarify the Order, to clearly state that [NCUC] has no jurisdiction to either prohibit a North Carolina utility from entering into a wholesale contract or to delay such utility entering into a wholesale sale contract." NCUC denied the motion, and CP&L, Duke Power, and NCEMC appealed to the North Carolina Court of Appeals. That court found that, under the Federal Power Act (FPA), Congress granted FERC exclusive jurisdiction over the regulation of the wholesale sale of electric energy in interstate commerce. Accordingly, the Court of Appeals vacated the 10 July 2002 order that NCUC had issued in Docket No. E-100, Sub 85A on the grounds that such orders were preempted by the FPA and violated the Supremacy Clause of the United States Constitution. *State ex rel. Utils. Comm'n v. Carolina Power & Light Co.*, 161 N.C. App. 199, 209, 588 S.E.2d 77, 83 (2003). Judge Wynn dissented, contending that no conflict existed between NCUC's order and federal law. *Id.* at 211, 588 S.E.2d at 84-85 (Wynn, J., dissenting). The North Carolina Attorney General, Public Staff—NCUC, Carolina Utility Customers Association, Inc., and Carolina Industrial Group for Fair Utility Rates II appeal on the basis of the dissent. Because this Court denied appellees' petition for discretionary review of additional issues, we consider only the issue raised in Judge Wynn's dissent.

Before we begin our analysis of the issues raised in this appeal, we review the relationship between North Carolina's Public Utilities Act, N.C.G.S. §§ 62-1 to -333 (2003), and the FPA. The General Assembly has determined that "the rates, services and operations of public utilities . . . are affected with the public interest and that the availability of an adequate and reliable supply of electric power . . . to the people, economy and government of North Carolina is a matter of public policy." *Id.* § 62-2(a). Accordingly, our legislature has conferred upon NCUC the authority "to regulate public utilities generally, their rates, services and operations, and their expansion in relation to long-term energy conservation and management policies and statewide development requirements." *Id.* § 62-2(b); *see also id.* § 62-30 (granting NCUC "general power and authority to supervise and control the public utilities of the State"). Thus, NCUC is respon-

sible for ensuring that, in exchange for having a monopoly in its franchise area, *see State ex rel. Utils. Comm'n v. Morgan*, 277 N.C. 255, 263, 177 S.E.2d 405, 410 (1970), a public utility provides adequate and reliable service to North Carolina citizens at reasonable rates. *State ex rel. Utils. Comm'n v. Thornburg*, 314 N.C. 509, 511, 334 S.E.2d 772, 773 (1985); *State ex rel. Utils. Comm'n v. S. Bell Tel. & Tel. Co.*, 307 N.C. 541, 545, 299 S.E.2d 763, 765 (1983); *see also* N.C.G.S. §§ 62-32, -110.1(d).

NCUC is required to "keep informed as to the public utilities, their rates and charges for service, and the service supplied and the purposes for which it is supplied." N.C.G.S. § 62-33. If NCUC finds that a utility's service is "inadequate" or that "any other act is necessary to secure reasonably adequate service or facilities and reasonably and adequately to serve the public convenience and necessity," the Public Utilities Act mandates that NCUC "enter . . . an order directing that such additions, extensions, repairs, improvements, or additional services or changes [to the existing plant or facilities] shall be made or affected within a reasonable time prescribed in the order." *Id.* § 62-42(a); *see also id.* § 62-32(b).

In addition, because public utilities are prohibited from constructing generating facilities without first obtaining a certificate of public convenience and necessity, *id.* § 62-110.1(a), NCUC is obligated to maintain an analysis of long-range needs for expansion of generating facilities, *id.* § 62-110.1(c). This analysis includes NCUC's "estimate of the probable future growth of the use of electricity, the probable needed generating reserves, . . . and arrangements for pooling power to the extent not regulated by the Federal Power Commission and other arrangements with other utilities and energy suppliers to achieve maximum efficiencies for the benefit of the people of North Carolina." *Id.* When a utility petitions to construct any additional facilities for the generation of electricity, NCUC is required to consider the applicant's "arrangements with other electric utilities for [the] interchange of power . . . [or] purchase of power" in acting upon the petition. *Id.* § 62-110.1(d). These sections of the Public Utilities Act indicate that NCUC has a duty to stay apprised of a utility's generating capacity and reserve margins to ensure that North Carolina citizens, including the utility's retail customers, receive adequate and reliable service.

While the North Carolina Public Utilities Act grants NCUC jurisdiction over intrastate sales and interstate retail sales of electric energy, as well as over the quality and reliability of local electric serv-

ice, the Federal Power Act granted the Federal Power Commission (FPC), FERC's predecessor, exclusive jurisdiction over the transmission and wholesale sale[1] of electric energy in interstate commerce. 16 U.S.C. § 824(b)(1) (2000) (originally enacted as Public Utility Act of 1935, ch. 687, § 201(b), 49 Stat. 803, 847-48); *see also New York v. FERC*, 535 U.S. 1, 5-9, 152 L. Ed. 2d 47, 55-57 (2002) (discussing the legislative history of the FPA and jurisdiction of the FPC and FERC); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 965-66, 90 L. Ed. 2d 943, 954 (1986) (establishing FERC's exclusive jurisdiction over interstate sales by a utility to wholesale customers and over wholesale rates and charges); *FPC v. S. Cal. Edison Co.*, 376 U.S. 205, 210, 11 L. Ed. 2d 638, 643 (1964) (same). However, the FPA expressly preserves NCUC's jurisdiction over utilities' generating plants. Section 824(a) declares that federal regulation is "to extend only to those matters which are not subject to regulation by the States." 16 U.S.C. § 824(a) (2000). While this provision of the FPA has been labeled a "policy declaration" that "cannot nullify a clear and specific grant of jurisdiction," *Conn. Light & Power Co. v. FPC*, 324 U.S. 515, 527, 89 L. Ed. 1150, 1158-59 (1945), nevertheless "such a declaration is relevant and entitled to respect as a guide in resolving any ambiguity or indefiniteness in the specific provisions which purport to carry out its intent . . . [and] cannot be wholly ignored[,]" *id.* at 527, 89 L. Ed. at 1159. Section 824(b)(1) then provides, in part:

> [FERC] shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in interstate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

16 U.S.C. § 824(b)(1). The United States Supreme Court has stated that this provision should "be read in harmony with [section 824(a)]." *Conn. Light & Power Co.*, 324 U.S. at 529, 89 L. Ed. at 1160.

Consistent with these provisions of the FPA, when FERC sought to open the wholesale power market to competition, it issued Order No. 888. Order No. 888, 61 Fed. Reg. 21,540 (May 10, 1996)

---

1. Although the North Carolina Public Utilities Act does not contain a definition of the term "wholesale," the FPA defines "sale of electric energy at wholesale" as "a sale of electric energy to any person for resale." 16 U.S.C. § 824(d) (2000).

("Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities"). This order acknowledged that states would retain significant control over local matters. *Id.* at 21,626 n.543 ("Among other things, Congress left to the States authority to regulate generation and transmission siting."). FERC further declared that Order No. 888 "will not affect or encroach upon state authority in such traditional areas as the authority over local service issues, including reliability of local service . . . [and] utility generation and resource portfolios." *Id.* at 21, 626 n.544, *cited in New York v. FERC*, 535 U.S. at 24, 152 L. Ed. 2d at 66 (citing Order No. 888, FERC Stats. & Regs. at 31,782 n.544); *see also State ex rel. Utils. Comm'n v. Thornburg*, 314 N.C. at 511, 334 S.E.2d at 773 (discussing generally the scope of NCUC's powers and duties under the North Carolina Public Utilities Act).

Thus, we see that while Congress granted FERC exclusive jurisdiction over the wholesale sale of electricity in interstate commerce, it nevertheless intended that the states and their utilities commissions retain their traditional authority over generating facilities and local supply adequacy and reliability. With this background, we now consider the issue of preemption raised in this appeal.

The Court of Appeals concluded that NCUC's 10 July 2002 order was "preempted by the FPA and violate[d] the Supremacy Clause of the Constitution of the United States." 161 N.C. App. at 209, 588 S.E.2d at 83. In response, NCUC argues before this Court that federal law does not preempt its authority to ensure that a regulated public utility has sufficient generating resources reliably and adequately to serve its retail customers. Accordingly, NCUC claims that it may conduct a pre-sale review of a utility's proposed grant of native load priority to a wholesale customer that will be supplied from the same generating plants as the utility's existing retail ratepayers.

The constitutional principle underlying the doctrine of preemption is the avoidance of conflicting regulation of conduct by various official bodies (such as NCUC and FERC), each of which has a degree of authority over the subject matter at issue. *See* John E. Nowak & Ronald D. Rotunda, *Constitutional Law* § 9.1, at 348 (6th ed. 2000). The United States Supreme Court has noted that preemption of state law by federal law can raise two distinct legal questions. *New York v. FERC*, 535 U.S. at 17, 152 L. Ed. 2d at 62. The first, which arises when determining the scope of a federal agency's power conferred upon it by Congress, *id.* at 18, 152 L. Ed. 2d at 62-63 (citing *La.*

STATE ex rel. UTILS. COMM'N v. CAROLINA POWER & LIGHT CO.

[359 N.C. 516 (2005)]

*Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 90 L. Ed. 2d 369, 385 (1986)), is not a concern in the instant case. Instead, we must address the other legal question that can arise in the context of preemption, that is, "whether a given state authority conflicts with, and thus has been displaced by, the existence of Federal Government authority." *Id.* at 17-18, 152 L. Ed. 2d at 62.

A reviewing court confronting this question begins its analysis with a presumption against federal preemption. *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715, 85 L. Ed. 2d 714, 722-23 (1985) ("Where . . . the field that Congress is said to have pre-empted has been traditionally occupied by the States 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' ") (alteration in original) (citations omitted); *see also New York v. FERC*, 535 U.S. at 17-18, 152 L. Ed. 2d at 62. Furthermore, as discussed above, Congress has chosen not to displace entirely state regulation of public utilities. 16 U.S.C. § 824(a), (b)(1). Consequently, NCUC's 10 July 2002 order is not preempted unless it actually conflicts with federal law. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204, 75 L. Ed. 2d 752, 765 (1983). "Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility,' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Id.* (citations omitted); *see also Pearson v. C.P. Buckner Steel Erection Co.*, 348 N.C. 239, 244, 498 S.E.2d 818, 821 (1998).

NCUC and other appellants argue that such a pre-sale review is not a traditional review of the prudence of the business practices of public utilities. *See, e.g.*, N.C.G.S. §§ 62-133, -133.2. Instead, NCUC contends that this review power has been granted "for the purpose of enforcing its lawfully imposed merger and certificate conditions and as part of the NCUC's assessment of generating supply adequacy."[2] *See id.* § 62-110.1(a), (c). As described above, in Docket No. E-2, Sub 733, CP&L applied to NCUC for certificates that would permit construction of additional generating capacity in Rowan and Richmond Counties. CP&L's need for these plants was created in part by its proposed contracts to sell power to two new wholesale customers at

_____

2. The only issue raised and argued in the instant appeal addresses NCUC's jurisdiction as related to its responsibility to monitor certain proposed contracts to ensure the availability of adequate and reliable power to a utility's retail customers. Accordingly, we do not address NCUC's authority over mergers and certifications.

native load priority. NCUC granted the requested certificates. However, when it issued the certificates, NCUC also required "[t]hat CP&L shall fully consider the wholesale market for future generation resource additions that will be used in whole or in part to serve retail customers whether by formal RFP or other measures that ensure a complete evaluation of the market" and that "CP&L shall ensure that its retail electric customers will not be disadvantaged in any manner, either from a quality of service or rate perspective, as a result of its participation in the wholesale power market." To ensure CP&L's compliance with these requirements, NCUC's order concerning CP&L's proposed merger with Florida Progress Corporation, Docket No. E-2, Sub 760, contained Regulatory Condition 21 (quoted above), which required a twenty-day notice to NCUC and the Public Staff of any proposed contract for the sale of wholesale power at native load priority.

While the 10 July 2002 order is now at issue rather than the two proceedings described immediately above, those proceedings were the impetus behind NCUC's initiation of Docket No. E-100, Sub 85A that resulted in the 10 July 2002 order. For example, evidence in the No. E-2, Sub 733 certificate proceedings indicated that unless CP&L added the requested megawatt capacity to its system, its capacity margin would fall to negative 1.4 percent, even though reliability analysis showed a target capacity margin of thirteen percent was appropriate for CP&L to meet its customers' requirements. When acting on a utility's petition for construction, NCUC needed this information to fulfill its statutory duties under N.C.G.S. § 62-110.1(c) and (d) to take into account both estimated future electrical energy demands and the petitioning utility's arrangements with other utilities. Furthermore, because the electric power CP&L would be selling at wholesale in an interstate market was to be generated from the same facilities that served its retail customers, knowledge of the proposed wholesale contracts was relevant to NCUC's duties to ensure that utility companies provide adequate and reliable service to the people of North Carolina. See N.C.G.S. §§ 62-2, -32, -33, -42; State ex rel. Utils. Comm'n v. Thornburg, 314 N.C. at 511, 334 S.E.2d at 773. Accordingly, we believe NCUC's actions in the No. E-2, Sub 733 and Sub 760 proceedings and NCUC's declaration of authority in the 10 July 2002 order were consistent both with the agency's duties and with the powers conferred upon it by the Public Utilities Act.

Moreover, NCUC's power to examine a utility's proposed contract granting native load priority to a wholesale customer does not con-

STATE ex rel. UTILS. COMM'N v. CAROLINA POWER & LIGHT CO.

[359 N.C. 516 (2005)]

flict with FERC's authority to make prudence inquiries concerning wholesale rates and charges. Under the FPA, all wholesale rates must be just and reasonable and filed with FERC. 16 U.S.C. § 824d(a), (c) (2000). FERC has the power to review such rates and charges, as well as the contracts that affect them, to ensure they are not "unjust, unreasonable, [or] unduly discriminatory or preferential." *Id.* § 824e(a) (2000). If, after conducting such an inquiry, FERC finds that the rates or charges in question violate these provisions, the agency is then required to "determine the just and reasonable rate, charge, . . . or contract" and fix or enforce "the same by order." *Id.* Moreover, section 824e(d) grants FERC authority to "investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of [FERC] in cases where [FERC] has no authority to establish a rate governing the sale of such energy." *Id.* § 824e(d) (2000).

In contrast, NCUC's review of a proposed grant of native load priority for wholesale customers serves a different purpose. NCUC's review allows it to remain apprised of pertinent matters of local concern, including the adequacy of the state's supply of electricity, North Carolina's public utilities' capacity and reserve margins, and any need for additional generating capacity. As FERC has noted, issues of local energy service, such as generating facilities and reliability of production, traditionally have been left to the states. *See* Order No. 888, 61 Fed. Reg. at 21,626 nn.543-44; *see also* 16 U.S.C. § 824(a), (b)(1). Therefore, while NCUC's review takes into account the intrastate consequences of the proposed contract, it does not duplicate FERC's inquiry into the prudence and fairness of the contract.

The proceedings in Docket No. E-2, Sub 798 further illustrate that NCUC's responsibilities do not clash with those of FERC. In Sub 798, CP&L filed the twenty-day notice mandated by Regulatory Condition 21 of Docket No. E-2, Sub 760, advising of its intent to enter into two wholesale contracts for the sale of power at native load priority. The Public Staff reviewed the contracts and, concluding that the contracts would not disadvantage CP&L's retail customers, raised no objections to CP&L's proposed activities. NCUC's twenty-day requirement did not inhibit CP&L from entering into the contracts or infringe upon the rates, charges, costs or other terms of the proposed sales. Although *amicus* Edison Electric Institute argues that such notice requirements hamper a utility's ability to respond quickly to the demands of a volatile market, we believe that NCUC has the expertise to consider the possible economic impact of such

notice conditions and the authority to impose them under appropriate circumstances.

NCUC's ability to conduct a pre-sale review for the purpose of evaluating the consequences of a proposed wholesale contract, when such review does not include the power to set rates in an interstate wholesale contract for the purported purpose of protecting North Carolina consumers or to conduct a prudence inquiry, distinguishes the instant case from *Appalachian Power Co. v. Public Serv. Comm'n*, 812 F.2d 898 (4th Cir. 1987), and *Utah v. FERC*, 691 F.2d 444 (10th Cir. 1982), both of which are cited in the Court of Appeals majority opinion and in the appellees' briefs to this Court. In *Appalachian Power Co.*, the Public Service Commission of West Virginia, acting pursuant to a state statute, sought to examine the prudence of an agreement between utilities operating in several states. 812 F.2d at 900-01. Under the agreement, the costs of wholesale interstate energy transmission would be allocated among the utilities, all of whom were members of a holding company. *Id.* The Fourth Circuit rejected the West Virginia Commission's assertion of state statutory authority, holding that such authority was preempted by the FPA because FERC "has exclusive jurisdiction to consider the merits of the interstate agreement." *Id.* at 900.

Similarly, in *Utah v. FERC*, the Public Service Commission of Utah issued an order requiring Utah Power, a public utility, "to submit for its approval all contracts for the sale of power to any customer or other utility . . . if the applicant intended to use any facilities over which the [Utah] Commission had jurisdiction." 691 F.2d at 446. Subsequently, the Utah Commission reviewed a wholesale agreement between Utah Power, which provided electric service to retail customers in Utah, Idaho and Wyoming, and Sierra Pacific Power Company, which provided retail electric service in Nevada and California. *Id.* at 445. The Utah Commission found that the agreement was "not in the best interest of" Utah Power's Utah customers and "ordered Utah Power to terminate firm service under the resale electric agreement as of December 31, 1984, unless there could be a renegotiation of the contract providing for rates reflecting incremental costs of supplying such service." *Id.* at 446. The Tenth Circuit rejected the Utah Commission's actions, holding that FERC had "exclusive authority in the area under consideration." *Id.* Examining previous utility cases, the court noted that rates in such wholesale agreements were "not subject to regulation by . . . the . . . states in the guise of protection of their respective local interests." *Id.* at 447.

STATE ex rel. UTILS. COMM'N v. CAROLINA POWER & LIGHT CO.

[359 N.C. 516 (2005)]

Here, unlike the West Virginia Commission, NCUC is not claiming through its 10 July 2002 order the authority to overrule or second-guess an agreement filed with or approved by FERC and subject to FERC's jurisdiction. *See Appalachian Power Co.*, 812 F.2d at 900-03, 905. Moreover, in contrast to the Utah Commission's attempted actions, NCUC is not attempting to set rates in a wholesale agreement. *See Utah v. FERC*, 691 F.2d at 446-47. Because the scope of NCUC's review does not include the authority to inquire into the prudence of a proposed contract or the power to overrule FERC, we do not perceive that NCUC's pre-sale review of the proposed grants of native load priority makes " 'compliance with both federal and state regulations . . . a physical impossibility,' or . . . 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of [the FPA].' " *Pac. Gas & Elec. Co.*, 461 U.S at 204, 75 L. Ed. 2d at 765 (citations omitted). Therefore, there is no "actual conflict between the two schemes of regulation that both cannot stand in the same area" and NCUC's actions are not preempted. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141, 10 L. Ed. 2d 248, 256 (1963).

Accordingly, we hold that federal law does not preempt NCUC's authority to conduct a pre-sale review of a utility's proposed grant of native load priority to a wholesale customer that will be supplied from the same generating plants as retail customers. The review authority that NCUC possesses is necessary to enable it to fulfill its obligations under the North Carolina Public Utilities Act by ensuring that a regulated public utility has sufficient generating resources to provide reliable and adequate service to its captive retail ratepayers.

Based on the foregoing, the decision of the Court of Appeals is reversed. The case is remanded to the Court of Appeals for consideration of the remaining issues.

REVERSED AND REMANDED.

Justice NEWBY did not participate in the consideration or decision of this case.

Justice MARTIN dissenting.

In reversing our Court of Appeals and holding that federal law does not preempt the North Carolina Utilities Commission (NCUC) order at issue under the Federal Power Act (FPA), the majority has,

in pursuit of an admittedly worthy objective, obscured the boundaries of clear and unambiguous federal preemption doctrine. At least six times in its opinion, the majority invokes the laudable goal of ensuring a stable supply of electricity for retail customers. NCUC may legitimately pursue this goal by seeking federal review of proposed interstate electricity contracts perceived to be "unjust, unreasonable, unduly discriminatory or preferential," 16 U.S.C. § 824e(a) (2000). NCUC may not, however, permissibly vest itself with jurisdiction to conduct pre-execution review of wholesale interstate electricity contracts. For better or worse, federal law preempts concurrent state regulation of interstate wholesale electricity contracts.

The Federal Energy Regulatory Commission (FERC) is the agency empowered with exclusive authority to pass on the propriety of wholesale electricity contracts. FERC has the authority to determine if wholesale rates and the contracts affecting them are "just and reasonable". 16 U.S.C. §§ 824d(a), 824e(a); see also Utah v. FERC, 691 F.2d 444, 448 (10th Cir. 1982) ("[FERC] can modify any rate, charge or classification or any rule, regulation, practice or contract affecting such rate if [FERC] finds it to be unjust, unreasonable, unduly discriminatory or preferential."). In the event that NCUC believes a contract is "unjust, unreasonable, unduly discriminatory or preferential," federal law empowers NCUC to seek FERC review. 16 U.S.C. § 824e(a). But NCUC cannot vest itself, consistent with federal preemption doctrine, with jurisdiction to conduct pre-execution review of wholesale interstate electricity contracts.

. It is well settled that federal preemption doctrine arises from the Supremacy Clause of the United States Constitution, which states that the Constitution and Laws of the United States "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. The basic premise of preemption doctrine is that federal law supersedes state laws that "interfere with, or are contrary to" federal law. Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211, 6 L. Ed. 23, 73 (1824). Congress can preempt state law by express terms. Jones v. Rath Packing Co., 430 U.S. 519, 525, 51 L. Ed. 2d 604, 614 (1977). Congress can also preempt state law by enacting a scheme of federal regulation so pervasive in a given field that there is no room for concurrent state regulation. Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 91 L. Ed. 1447, 1459 (1947). When Congress has not completely displaced state regulation in a given field, federal law invalidates any conflicting state law. Hillsborough Cty. v. Automated Med. Labs., Inc., 471 U.S. 707, 713, 85 L. Ed. 2d 714, 721 (1985). Conflict can arise when compliance with

both state and federal law is a "physical impossibility." *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43, 10 L. Ed. 2d 248, 257 (1963). Conflict can also arise when state law either conflicts with or presents "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 66-67, 85 L. Ed. 581, 586-87 (1941); *see also Owens v. Pepsi Cola Bottling Co.*, 330 N.C. 666, 675, 412 S.E.2d 636, 641 (1992).

I acknowledge that when a case concerns the validity of state regulation in a field traditionally occupied by the states, there is a presumption against federal preemption. *Hillsborough Cty.*, 471 U.S. at 715-16, 85 L. Ed. 2d at 722-23. Moreover, it is undisputed that states do possess authority to regulate many aspects of electricity, such as retail sales. *See Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 970, 90 L. Ed. 2d 943, 956 (1986) (noting that states have "undoubted jurisdiction over retail sales"). The instant case, however, presents a conflict between the NCUC order in question and federal electricity law.

The origins of federal preemption of wholesale electricity sales can be traced to *Public Utilities Commission v. Attleboro Steam & Electric Co.*, 273 U.S. 83, 71 L. Ed. 549 (1927). The plaintiff in *Attleboro* was a Rhode Island utility, which sold power to a Massachusetts utility. *Id.* at 84-85, 71 L. Ed. at 551. After reviewing the contract between the two utilities and finding the contract rate unreasonably low, the Public Utilities Commission of Rhode Island issued an order increasing the rate to be charged for the interstate electricity service at issue. *Id.* at 85-86, 71 L. Ed. at 551-52. The United States Supreme Court noted that nothing would prevent Massachusetts from taking retaliatory action and reducing the rate. *Id.* at 90, 71 L. Ed. at 554. Stating that "the paramount interest in the interstate business carried on between the two companies is not local to either State, but is essentially national in character," the United States Supreme Court held that only Congress could regulate the rate for interstate sales of electricity. *Id.* This case created the "*Attleboro* gap" in utilities regulation, i.e., states could not regulate interstate wholesale sales yet Congress had not stepped in with wholesale regulation of its own. Congress eventually filled this gap with the FPA, which regulated wholesale electricity sales in interstate commerce. 16 U.S.C. § 824. *See generally New York v. FERC*, 535 U.S. 1, 5-7, 152 L. Ed. 2d 47, 55-56 (2002) (tracing the history of the FPA).

The FPA states that federal regulation is necessary for "that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce." 16 U.S.C. § 824(a). Federal regulation is to extend "only to those matters which are not subject to regulation by the States." *Id.* The FPA defines a wholesale sale as "a sale of electric energy to any person for resale." 16 U.S.C. § 824(d).

In discussing the relationship between *Attleboro* and the FPA, the United States Supreme Court has stated that "[*Attleboro*] left no power in the states to regulate licensees' sales for resale in interstate commerce, while the [FPA] established federal jurisdiction over such sales." *United States v. Pub. Utils. Comm'n*, 345 U.S. 295, 311, 97 L. Ed. 1020, 1035 (1953). Since then, United States Supreme Court decisions have made clear that FERC has plenary authority over wholesale sales of electric power. *See Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 374, 101 L. Ed. 2d 322, 340 (1988) ("Congress has drawn a bright line between state and federal authority in the setting of wholesale rates and in the regulation of agreements that affect wholesale rates."); *Nantahala*, 476 U.S. at 966, 90 L. Ed. 2d at 954 ("A State must rather give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority."); *FPC v. S. Cal. Edison Co.*, 376 U.S. 205, 216, 11 L. Ed. 2d 638, 646 (1964) (stating that Congress gave FERC's predecessor, the Federal Power Commission, exclusive jurisdiction over wholesale sales in interstate commerce).

At issue in the present case is an order entered by the NCUC on 10 July 2002 in Docket No. E-100, Sub 85A, which states:

> The Commission concludes that it has jurisdiction and authority under State law to review, before they are signed, proposed *wholesale contracts* by a regulated North Carolina public utility granting native load priority to be supplied from the same plant as retail ratepayers and to take appropriate action if necessary to secure and protect reliable service to retail customers in North Carolina.

(emphasis added). The NCUC order does not delineate what such a pre-contract "review" could entail. A fair reading of NCUC's "appropriate action" language reserves to NCUC the right to modify any part of a contract, including the rate, or to prevent the utility from executing it. This expansive view of NCUC's purported authority was

STATE ex rel. UTILS. COMM'N v. CAROLINA POWER & LIGHT CO.

[359 N.C. 516 (2005)]

confirmed at oral argument when, upon questioning by this Court, the proponents of pre-contract review stated that they believe NCUC could in fact prevent a utility from granting native load priority in a wholesale contract.

This order conflicts with federal law. The United States Supreme Court has interpreted the FPA to provide FERC with exclusive, plenary jurisdiction over wholesale contracts. 16 U.S.C. § 824(a); *Miss. Power & Light Co.*, 487 U.S. at 374, 101 L. Ed. 2d at 340. The NCUC order in the instant case purports to give NCUC authority to regulate such contracts through pre-execution review. Thus, NCUC's attempt to regulate contracts in the face of federal jurisdiction over the same subject matter clearly presents "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," and is, consequently, preempted. *Hines*, 312 U.S. at 67, 85 L. Ed. at 587.

Preemption is mandated in the instant case because of the potential for conflict between the NCUC order and FERC's jurisdiction over wholesale contracts. This conflict could lead to a chaotic situation quite similar to that which led to enactment of the FPA itself. For example, multiple North Carolina utilities under NCUC's jurisdiction are also regulated by the Public Service Commission of South Carolina. If states are not preempted from performing a pre-execution review, South Carolina could perform its own review and impose conditions regarding certain contracts that might conflict with potential North Carolina orders. Like Rhode Island and Massachusetts in *Attleboro*, North Carolina and South Carolina could attempt to impose conflicting orders concerning the same subject matter. *See Attleboro*, 273 U.S. at 90, 71 L. Ed. at 554. This scenario presents the type of conflict contemplated by the United States Supreme Court in *Attleboro* that led to the FPA and federal preemption. *Id.*

Preemption is also mandated by United States Supreme Court decisions regarding FERC jurisdiction. The United States Supreme Court has made clear that the preemptive consequences of FERC. jurisdiction over wholesale contracts extend to more than merely rate regulation and include the type of review contemplated by NCUC. In *Nantahala*, the United States Supreme Court held that NCUC could not circumvent FERC by using retail ratemaking power, stating, "When FERC sets a rate between a seller of power and a wholesaler-as-buyer, a State may not exercise its undoubted jurisdiction over retail sales to prevent the wholesaler-as-seller from recovering the costs of paying the FERC-approved rate." *Nantahala*, 476

U.S. at 970, 90 L. Ed. 2d at 956. In the instant case, NCUC is attempting to bypass FERC wholesale jurisdiction by using traditional regulatory authority. FERC's wholesale rate jurisdiction, however, goes beyond the actual rate itself, and NCUC may not use its traditional authority to undermine that jurisdiction. Accordingly, FERC provides the exclusive forum for disputes over wholesale contracts.

Similarly, in *Mississippi Power & Light Co.*, a state regulator attempted to remedy a perceived failing in a FERC-approved transaction. *Mississippi Power & Light Co.* involved a FERC decision to allow a utility to recover a high cost of power in a wholesale agreement. 487 U.S. at 363, 101 L. Ed. 2d at 333. The Mississippi Supreme Court concluded that in order to approve a pass-through of the FERC-approved costs to consumers, the state regulatory agency needed to conduct a prudence review of the wholesale transaction. *Id.* at 367, 101 L. Ed. 2d at 335. The United States Supreme Court reversed, declaring that: "States may not regulate in areas where FERC has properly exercised its jurisdiction to determine just and reasonable wholesale rates or to insure that agreements affecting wholesale rates are reasonable." *Id.* at 374, 101 L. Ed. 2d at 340. *Mississippi Power & Light Co.* reinforces the principle that FERC's wholesale jurisdiction is plenary, i.e., states may not regulate utilities so as to contravene or undermine FERC with respect to wholesale contracts.

To support its legal departure from the moorings of clearly established federal preemption doctrine, the majority references the FPA's saving clause, which states that "such Federal regulation . . . extend[s] only to those matters which are not subject to regulation by the States." 16 U.S.C. § 824(a). This provision, however, does not prevent federal preemption of the instant NCUC order for three reasons. First, as the majority notes, the United States Supreme Court has definitively stated that the FPA's saving clause is a mere "policy declaration" that "cannot nullify a clear and specific grant of jurisdiction." *Conn. Light & Power Co. v. FPC*, 324 U.S. 515, 527, 89 L. Ed. 1150, 1158-59 (1945). And the FPA specifically grants FERC jurisdiction over wholesale electricity sales. 16 U.S.C. § 824(a).

Second, the FPA's saving clause still serves a vital purpose, as states are able to exercise significant regulatory power over utilities despite being preempted from regulating wholesale contracts. For example, as the majority notes, if NCUC finds a utility's service to be "inadequate, insufficient or unreasonably discriminatory," it can

"enter and serve an order directing that such additions, extensions, repairs, improvements, or additional services or changes . . . be made . . . within a reasonable time prescribed." N.C.G.S. § 62-42(a) (2003). NCUC can also require certificates of public convenience and necessity before allowing the construction of generating facilities, N.C.G.S. § 62-110.1(a), and it can take into account the utility's arrangements for the interchange and purchase of power when acting on a petition for construction. N.C.G.S. § 62-110.1(d). But the FPA's saving clause does not permit states to regulate in areas preempted by Congress.

Finally, the FPA's saving clause applies only to areas "which are not subject to regulation by the States." 16 U.S.C. § 824(a). When the FPA was originally enacted in 1935, the wholesale electricity market as it operates today did not exist. In 1996 FERC issued an order to infuse competition into the interstate wholesale electricity market. *See* FERC Order No. 888, 61 Fed. Reg. 21,540 (May 10, 1996) ("Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities"). The FERC order required that utilities controlling transmission facilities file open access non-discriminatory tariffs for the use of the facilities, thus opening up the wholesale power market to competition. *Id.*

In issuing its order, FERC's goal was to "remove impediments to competition in the wholesale bulk power marketplace and to bring more efficient, lower cost power to the Nation's electricity consumers." *Id.* FERC's order, combined with changes in technology, allowed for the emergence of a national wholesale market in electricity. *See generally New York v. FERC*, 535 U.S. at 5-14, 152 L. Ed. 2d at 55-60 (describing the evolution of the wholesale market); William H. Penniman & Paul B. Turner, *A Jurisdictional Clash Over Electricity Transmission:* Northern States Power v. FERC, 20 Energy L.J. 205, 207-10 (1999) (describing the evolution and effects of Order No. 888). Such a market did not exist at the time of the FPA's enactment in 1935, when competition among utilities was the exception. *New York v. FERC*, 535 U.S. at 5, 152 L. Ed. 2d at 55. In other words, NCUC is attempting, in the present case, to regulate contracts in a federally-inspired, rapidly evolving market that did not exist at the time the FPA was enacted. The regulation of modern wholesale contracts in the manner attempted by NCUC, therefore, cannot be said to constitute a power "traditionally" exercised by the states. Rather, Congress has specifically granted FERC authority to regulate this rapidly evolving market. *See* 16 U.S.C. §§ 824(a), 824d(a),

536 IN THE SUPREME COURT

STATE ex rel. UTILS. COMM'N v. CAROLINA POWER & LIGHT CO.

[359 N.C. 516 (2005)]

824e(a). Accordingly, to the extent that this market is federally-created regulatory territory, the saving clause in 16 U.S.C. § 824(a) does not reserve the power to states to regulate the wholesale interstate electricity market.

The majority unpersuasively attempts to distinguish the pre-contract review performed by NCUC from FERC's prudence review authority. The majority reasons that since FERC's and NCUC's authorities derive from different sources and apply to different concerns, they do not pose a potential for conflict. In the majority's view, pre-contract review is a legitimate exercise of NCUC's traditional authority to regulate utilities to insure reliability of service for consumers, whereas FERC's prudence review ability is a legitimate exercise of FERC's authority under the FPA to insure that wholesale rates and the contracts affecting them are "just and reasonable". 16 U.S.C. §§ 824d(a), 824e(a). But the concurrent federal and state regulatory inquiries the majority envisions are not necessarily mutually exclusive. Rather, the potential for conflict is clear when a proposed interstate wholesale electricity contract is concurrently reviewed by two separate regulatory authorities to determine whether the contract is "just and reasonable" as well as "fair to consumers."

As an illustration, the majority examines the proceedings in Docket No. E-2, Sub 733 regarding regulatory conditions imposed upon Carolina Power & Light Company (CP&L). Those proceedings are relevant, however, only as background. They do not have any bearing on the order in question, NCUC's 10 July 2002 order from Docket No. E-100, Sub 85A. Regardless of how NCUC actually applied a pre-contract review pertaining to CP&L, the 10 July 2002 order contains language propounded by NCUC that asserts plenary pre-execution authority over wholesale contracts. The United States Supreme Court has stated: "The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field." *Fla. Lime & Avocado Growers, Inc.*, 373 U.S. at 142, 10 L. Ed. 2d at 256-57. Here, NCUC is attempting to undermine FERC authority by granting itself regulatory jurisdiction over the same terms of the same contracts that FERC governs pursuant to the FPA. The majority states that "NCUC's twenty-day requirement did not inhibit CP&L from entering into the contracts or infringe upon the rates, charges, costs or other terms of the proposed sales." This may be true, but the majority does not consider that the jurisdiction claimed by NCUC *could* have allowed it to do any of

STATE ex rel. UTILS. COMM'N v. CAROLINA POWER & LIGHT CO.

[359 N.C. 516 (2005)]

those things, which would clearly come into conflict with FERC's prudence review of the same contract.

Contrary to the majority's assertion, NCUC's authority to monitor utility service reliability and reserve capacity is not at issue here. As noted above, NCUC has the obligation to monitor long-range electricity supply and demand and has the power to require utilities to submit reports concerning power generation, expected demand, and dealings with other power providers. N.C.G.S. § 62-110.1(c), (d). All of this can be effectuated without impermissibly interfering with wholesale contracts. As a result, NCUC has the authority to keep apprised of the effects of a utility's wholesale contracts after they have taken effect, but NCUC is clearly preempted by federal law from reviewing, modifying, or rejecting such contracts before their execution.

The majority properly observes that NCUC is preempted from conducting a prudence review or overruling FERC, yet allows NCUC to conduct pre-execution review of wholesale interstate electricity contracts. Exactly what regulatory actions NCUC may take pursuant to the majority's newly-created review authority is left unexplained. The majority states that state regulatory review allows NCUC to "remain apprised of pertinent matters of local concern, including the adequacy of the state's supply of electricity, North Carolina's public utilities' capacity and reserve margins, and any need for additional generating capacity." The modal ability to "remain apprised" of the terms of proposed wholesale contracts, however, does not concomitantly vest NCUC with authority to modify the terms of such contracts through the "back door." In short, if NCUC is preempted from conducting a prudence review, as the majority acknowledges, NCUC cannot modify or reform the proposed terms of such contracts. Accordingly, NCUC is preempted from exercising the potentially open-ended authority it purports to exercise in its 10 July 2002 order.

The majority attempts to distinguish two cases which are, in fact, directly on point. Both cases involve attempted review and modification of wholesale agreements by state regulatory agencies. In *Appalachian Power Co. v. Public Service Commission*, the Public Service Commission of West Virginia tried to require a utility to submit a FERC-approved wholesale contract for prudence review. 812 F.2d 898, 899-902 (4th Cir. 1987). The Fourth Circuit found the state's regulatory assertion to be preempted, holding, "Because it

STATE ex rel. UTILS. COMM'N v. CAROLINA POWER & LIGHT CO.

[359 N.C. 516 (2005)]

is fundamentally at odds with the scheme Congress has established in the FPA to allow the states to change the arrangements filed with or established by FERC, we find the authority the [Public Service Commission] asserts here violative of the supremacy clause." *Id.* at 905.

Similarly, *Utah v. FERC* involved an attempt by the Utah Public Service Commission to require modification of a FERC-approved wholesale agreement. 691 F.2d at 445-46. The Tenth Circuit held the state's action to be preempted, stating that "once a utility becomes involved in sales of interstate commodities it brings itself under the regulatory authority of the FERC, and its remedy is to obtain review and to appeal ultimately to the Supreme Court." *Id.* at 448. Again, this case demonstrates that a state utility commission is preempted from interfering with FERC-regulated wholesale contracts.

The majority attempts to distinguish these two cases on the ground that they both concerned executed, FERC-filed agreements, while NCUC is purporting to assert pre-execution review authority over wholesale interstate contracts. The preemption holdings of *Appalachian Power* and *Utah*, however, did not hinge on the *timing* of the state's attempted regulation of wholesale contracts, and the majority's reasoning to the contrary is unconvincing. Put simply, if a state is preempted from reviewing, modifying, or rejecting a wholesale agreement after execution, it is obviously preempted from attempting the same action before execution. Congress has determined that FERC is vested with exclusive regulatory authority over wholesale electricity contracts. *See* 16 U.S.C. § 824(a). And it is not within the authority of this Court to revise the FPA.

FERC has asserted its jurisdiction over these contracts in the form of pre-approved terms and conditions for competitive wholesale transactions. Federal preemption bars concurrent state regulation when, as here, NCUC's attempted regulation presents "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67, 85 L. Ed. at 587. If the majority is correct in its reasoning, however, state regulators could arbitrarily exert power to influence utilities' decisions regarding wholesale contracts before such contracts are executed. For example, in a pre-execution review, NCUC could unilaterally set conditions for a utility attempting to enter into a wholesale agreement that would not affect the contract rate or terms *per se*, but that would effectively prevent the utility from executing the contract. Congress

**IN RE R.T.W.**

[359 N.C. 539 (2005)]

has provided FERC with exclusive authority over wholesale contracts, and NCUC's asserted pre-execution review authority presents a clear obstacle to this congressional objective in that it allows NCUC to functionally override FERC—simply by regulating first.

It is undisputed that NCUC plays a crucial role in protecting North Carolina's captive retail electricity consumers. NCUC has broad statutory authority to accomplish this important objective. Congress has exclusively entrusted the regulation of wholesale interstate electricity contracts, however, to FERC. Undoubtedly, NCUC has the authority to require notice of the terms of such contracts, but it cannot otherwise regulate them. Although NCUC may seek federal review of a contract perceived to be "unjust, unreasonable, unduly discriminatory or preferential," 16 U.S.C. § 824e(a), it cannot vest itself, consistent with federal preemption doctrine, with jurisdiction to conduct pre-execution review of wholesale interstate electricity contracts.

I would affirm the decision of the Court of Appeals.

Justice BRADY joins in this dissenting opinion.