NO. COA13-566

NORTH CAROLINA COURT OF APPEALS

Filed:  4 March 2014

IN THE MATTER OF:
APPLICATION OF DUKE ENERGY
CORPORATION AND PROGRESS ENERGY,
INC., TO ENGAGE IN A BUSINESS
COMBINATION TRANSACTION AND TO
ADDRESS REGULATORY CONDITIONS AND
CODES OF CONDUCT

                              N.C. Utilities Commission
                              Nos. E-2, Sub 998
                                   E-7, Sub 986


Appeal by City of Orangeburg, South Carolina and N.C. Waste Awareness and Reduction Network from order entered 29 June 2012 by the N.C. Utilities Commission.  Heard in the Court of Appeals 6 November 2013.

*Allen Law Offices, PLLC, by Dwight W. Allen, Britton H. Allen, and Brady W. Allen; Duke Energy Corporation Deputy General Counsel Lawrence B. Somers; and Womble Carlyle Sandridge & Rice, LLP, by James P. Cooney, III, for Appellee Duke Energy Corporation.*

*Spiegel & McDiarmid, LLP, by James N. Horwood and Peter J. Hopkins, pro hac vice; and Schiller & Schiller, PLLC, by David G. Schiller, for Intervenor-Appellant City of Orangeburg, South Carolina.*

*The Law Offices of F. Bryan Brice, Jr., by Matthew D. Quinn; and John D. Runkle, for Intervenor-Appellant N.C. Waste Awareness Reduction Network.*

*Public Staff Chief Counsel Antoinette R. Wike and Staff Attorney Gisele L. Rankin, for Appellee Public Staff-North Carolina Utilities Commission.*

McCULLOUGH, Judge.

Intervenors City of Orangeburg, South Carolina ("Orangeburg") and N.C. Waste Awareness and Reduction Network ("NC WARN") appeal from order of the N.C. Utilities Commission (the "Commission") entered 29 June 2012. For the following reasons, we affirm the Commission's order and dismiss Orangeburg's appeal.

## I. Background

In accordance with N.C. Gen. Stat. § 62-111(a), on 4 April 2011, Duke Energy Corporation ("Duke") and Progress Energy, Inc. ("Progress") (collectively the "applicants") submitted an application to the Commission for authorization to: "engage in a business combination transaction; revise and apply Duke Energy Carolinas, LLC's ("DEC") Regulatory Conditions and Code of Conduct to Progress and Progress Energy Carolinas, Inc. ("PEC"); and nullify PEC's Regulatory Conditions and Code of Conduct." DEC and PEC, wholly-owned subsidiaries of Duke and Progress, respectively, are electric utilities organized, existing, and operating under the laws of the State of North Carolina. Pursuant to the terms of the Agreement and Plan of Merger (the "merger agreement") entered into by the applicants and attached

to the application as Exhibit 1, the business combination transaction (the "merger") would occur at the holding company level with Diamond Acquisition Corporation, a wholly-owned subsidiary of Duke, merging with and into Progress with the result that Progress survives the merger as a wholly-owned subsidiary of Duke.[1] Progress and PEC would remain separate legal entities following the merger, with the plan that PEC and DEC would merge into a single legal entity in the future.

On 27 April 2011, the Commission entered an Order Scheduling Hearing, Establishing Procedural Deadlines, and Requiring Public Notice. By the terms of the order, a Commission hearing on the application was scheduled to begin on 20 September 2011.

In the interim, the Commission allowed the intervention of thirty-seven (37) different parties, including the Commission's public staff and appellants NC WARN and Orangeburg. Regarding appellants, NC WARN filed a petition to intervene on 27 May 2011 that the Commission granted by order entered 7 June 2011; Orangeburg filed a petition to intervene on 5 August 2011 that the Commission granted by order entered 12 August 2011. Also in the interim, on 2 September 2011, the applicants and the public

---

[1]Duke would acquire all issued and outstanding common stock of Progress in exchange for Duke common stock.

staff entered into an agreement and stipulation of settlement (the "Stipulation") for consideration by the Commission pursuant to N.C. Gen. Stat. § 62-69.

By Commission order entered following a pre-hearing conference on 19 September 2011, the application, certain exhibits, the revised Joint Dispatch Agreement, the Stipulation, and the corrected Regulatory Conditions and Code of Conduct were admitted into evidence as if introduced at the hearing on the application set to begin the following day.

The Commission hearings on the application then began as scheduled on 20 September 2011. The hearings lasted three days, concluding on 22 September 2011. A supplemental hearing was later held on 25 June 2012.

On 27 June 2012, NC WARN filed an offer of proof alleging that many facts relevant to the merger had changed significantly since the September 2011 hearings and, therefore, the Commission should reopen the hearing process. The Commission, however, determined the offer of proof was defective and on 29 June 2012 entered an Order Approving Merger Subject to Regulatory Conditions and Code of Conduct (the "merger order"). In the merger order, which includes 41 findings of fact and over 80 pages of analysis discussing the evidence and reasoning

supporting the findings, the Commission stated its conclusions as follows:

> The Commission concludes that the Stipulation, Regulatory Conditions, Code of Conduct, Supplemental Stipulation, as amended, guaranteed fuel and fuel-related savings, Applicants' contributions to various work force development, low-income assistance, environmental and charitable programs, and the potential for future merger cost savings for ratepayers are sufficient to ensure that: (1) the merger will have no adverse impact on the rates and service of DEC's and PEC's North Carolina retail ratepayers; (2) DEC's and PEC's North Carolina retail ratepayers are protected as much as reasonably possible from potential costs and risks resulting from the merger; and (3) there are sufficient benefits from the merger to offset the potential costs and risks. Therefore, the Commission further concludes that the proposed business combination between Duke and Progress is justified by the public convenience and necessity.

In accordance with the terms of the merger order, the applicants filed a statement notifying the Commission they accepted and agreed with all terms, conditions, and provisions of the merger order on 2 July 2010, the same day the merger was finalized.

On 26 July 2012, NC WARN filed a motion for reconsideration of the merger order. The Commission denied NC WARN's motion by order entered 10 December 2012.

Orangeburg and NC WARN appealed from the merger order to this Court.[2]

## II. Discussion

NC WARN and Orangeburg raise distinct issues on appeal. On the one hand, NC WARN challenges the merger as a whole, claiming there is not substantial evidence to support the Commission's decision to approve the merger. On the other hand, Orangeburg challenges the constitutionality of certain regulatory conditions imposed in connection with the Commission's approval of the merger. We address these issues separately.

## A. Standard of Review

The scope of this Court's review of a Commission decision is governed by statute. As our Supreme Court has recognized, "'[t]he decision of the Commission will be upheld on appeal unless it is assailable on one of the statutory grounds enumerated in [N.C. Gen. Stat. §] 62-94(b).'" *State ex rel. Utilities Com'n v. Cooper*, 366 N.C. 484, 490, 739 S.E.2d 541, 545 (2013) (quoting *State ex rel. Utilities Com'n v. Carolina*

---

[2]NC WARN also appealed from the Commission's denial of its motion for reconsideration. The issues related to the denial of NC WARN's motion for reconsideration, however, were dismissed by the Commission on 29 April 2013 following Duke's 7 March 2013 motion to dismiss.

*Utility Customers Ass'n* (*CUCA I*), 348 N.C. 452, 459, 500 S.E.2d 693, 699 (1998)). N.C. Gen. Stat. § 62-94(b) provides:

> So far as necessary to the decision and where presented, the court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action. The court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional provisions, or
>
> (2) In excess of statutory authority or jurisdiction of the Commission, or
>
> (3) Made upon unlawful proceedings, or
>
> (4) Affected by other errors of law, or
>
> (5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or
>
> (6) Arbitrary or capricious.

N.C. Gen. Stat. § 62-94(b) (2013). As explained by our Supreme Court,

> "[t]his Court's role under section 62-94(b) is not to determine whether there is evidence to support a position the Commission did not adopt. Instead, the test upon appeal is whether the Commission's findings of fact are supported by competent,

> material and substantial evidence in view of the entire record. Substantial evidence [is] defined as more than a scintilla or a permissible inference. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. The Commission's knowledge, however expert, cannot be considered by this Court unless the facts and findings thereof embraced within that knowledge are in the record. Failure to include all necessary findings of fact is an error of law and a basis for remand under section 62-94(b)(4) because it frustrates appellate review."

*Cooper*, 366 N.C. at 490-91, 739 S.E.2d at 545 (quoting *CUCA I*, 348 N.C. at 460, 500 S.E.2d at 699-700 (alteration in original) (citations and internal quotation marks omitted)); *see also State ex rel. Utilities Com'n v. Village of Pinehurst*, 99 N.C. App. 224, 226, 393 S.E.2d 111, 113 (1990) ("[T]he essential test to be applied is whether the Commission's order is affected by errors of law or is unsupported by competent, material, and substantial evidence in view of the entire record as submitted."). Yet, "[u]pon any appeal, . . . any . . . finding, determination, or order made by the Commission . . . shall be prima facie just and reasonable." N.C. Gen. Stat. § 62-94(e).

### B. NC WARN's Appeal

NC WARN is a not-for-profit corporation with members across North Carolina that, according to its motion to intervene, seek "to reduce hazards to public health and the environment from

nuclear power and other polluting electricity production through energy efficiency and renewable energy resources." In this case, NC WARN was allowed to intervene to advocate that the Commission investigate the public convenience and necessity of the merger and to address its members' concerns regarding the merger's potential impacts on the cost of electricity, renewable energy projects, and energy efficiency programs.

Now on appeal, NC WARN contends the Commission erred in approving the merger because there was insufficient evidence to support approval. Specifically, NC WARN argues: (1) the applicants failed to submit evidence of the risks posed by the merger; (2) there is no evidence the merger will result in benefits to the public; and (3) the merger is not justified by the public convenience and necessity.

As provided in the Public Utilities Act, "[n]o . . . merger or combination affecting any public utility [shall] be made through acquisition or control by stock purchase or otherwise, except after application to and written approval by the Commission, which approval shall be given if justified by the public convenience and necessity." N.C. Gen. Stat. § 62-111(a) (2013). Since 2000, the Commission has required that applicants submit market-power and cost-benefit analyses as part of an

application for an electric utility merger. *See Order Requiring Filing of Analyses*, Docket No. M-100, Sub 129, at 7 (2 November 2000) (the "Sub 129 Order").

## 1. Merger Risks

NC WARN first argues that neither the application nor applicants addressed the risks posed by the merger, as required by the Sub 129 Order. We disagree. Although there was no specific document titled cost-benefit analysis, we find there was sufficient consideration of the risks of the merger.

In approving the merger, the Commission explicitly found "[t]he Applicants . . . are in compliance with the filing requirements established in the Sub 129 Order with respect to the market power and cost-benefit analyses submitted with the application." This finding reiterated a prior 27 April 2011 Commission order concluding the application satisfied the filing requirements of the Sub 129 order.

Upon review of the record, we hold there was substantial evidence to support the Commission's approval where, in addition to the application, the applicants submitted investment analyses from three different financial institutions, an analysis of the economic efficiencies under joint dispatch, a fuel synergies review, and a market power study, among other exhibits.

Despite recognition of the analyses submitted by the applicants, NC WARN argues the analyses only examined the potential benefits of the merger and did not constitute a comprehensive cost-benefit analysis. We hold that the Commission adequately addressed this argument in discussing its finding that the applicants met the filing requirements of the Sub 129 Order. In the merger order, the Commission noted, "[t]he purpose of such analyses is to assist the Commission in determining whether or not a merger meets the statutory standard for approval." The Commission then explained,

> [t]he Applicants stated in the application that the actual integration of Duke and Progress and their service companies is expected to produce cost savings in addition to those identified in the Compass Lexecon Study and the Fuel Synergies Review and that there will be upfront costs associated with achieving these savings. The fact that the application did not include a quantification of the costs and benefits associated with these non-fuel savings, along with the exhibits quantifying direct and immediate fuel savings, does not constitute a filing deficiency insofar as the Sub 129 Order is concerned. Moreover, as discussed . . . , the record contains ample evidence regarding the Applicants' estimates of both fuel and non-fuel savings to support a decision as to whether the merger meets the statutory standard for approval.

We find it evident from a review of the merger order that the Commission had sufficient evidence to determine whether the merger was justified by the public convenience and necessity.

Throughout the merger order, the Commission weighed and balanced the benefits of the merger with the known and potential costs and risks of the merger. Specifically, in Finding of Fact 22, the Commission documented the potential costs and risks to retail ratepayers that it considered.

> Known and potential costs and risks of the merger to North Carolina retail ratepayers include direct merger costs and other merger-related cost increases that could impact North Carolina retail rates; the potential for preemption of the Commission's regulatory authority under the FPA, particularly as it relates to the JDA and the Joint OATT, and under the Public Utility Holding Company Act of 2005 (PUHCA 2005); potential adverse effects on DEC and PEC of transactions within the holding company family and the resulting need for increased regulatory oversight of such transactions, including the treatment of joint dispatch costs and savings; the potential for DEC and PEC to unreasonably favor their unregulated affiliates over nonaffiliated suppliers of goods and services; potential adverse impacts on DEC's and PEC's cost of capital; the exposure of DEC, PEC, and their respective retail ratepayers to costs and risks associated with Duke, Progress, and their subsidiaries; and the potential for DEC's and PEC's quality of service to deteriorate because of increased management focus on cost savings and earnings growth.

In identifying these costs and risks, the Commission noted that "[t]he known and potential costs and risks to North Carolina retail ratepayers from a merger affecting one or more regulated electric utilities have been well documented in prior merger proceedings." The Commission further found, however, that despite these costs and risks, the retail ratepayers were adequately protected by the Regulatory Conditions and Stipulation approved by the Commission with the merger.

Although no single document entitled cost-benefit analysis was presented by the applicants quantifying the known and potential costs and risks of the merger, we hold there was sufficient evidence of the costs, considering the benefits and protections afforded to retail ratepayers, to allow the Commission to determine that the merger met the statutory standard for approval.

## 2. Public Benefit

NC WARN also argues that there is no evidence that the merger will result in benefits to the public. NC WARN instead maintains that the benefits resulting from the merger accrue solely to the benefit of the emerging entity. We disagree.

Based on claims in the application and supporting evidence in the analysis of economic efficiencies under joint dispatch and fuel synergies review, the Commission found,

> [t]he primary quantifiable benefits of the merger to North Carolina retail ratepayers consist of an estimated $364.2 million in total system fuel and fuel-related cost savings over the five-year period 2012 through 2016 through joint dispatch of DEC's and PEC's generation assets and an additional estimated $330.7 million in total system fuel and fuel-related system cost savings through sharing and implementing best practices for fuel procurement and use over the same five-year period.

These savings in turn benefit the ratepayers. As further found by the Commission,

> [t]he Stipulation [agreed upon by the applicants and the public staff] guarantees that North Carolina retail ratepayers will receive their allocable share of $650 million of these cost savings, as well as a small amount of non-fuel operations and maintenance (O&M) cost savings, over five years through DEC's and PEC's annual fuel clause proceedings. . . . Further, if the fuel and fuel-related savings achieved by DEC and PEC exceed the guaranteed $650 million during the first five years after the merger, then North Carolina ratepayers will receive their allocable share of the additional savings.

NC WARN does not dispute the fuel cost savings on appeal, but contends the savings are temporary, are not a product of the merger, and are diminished by settlements to allocate fuel

savings to wholesale customers.  We are unpersuaded by NC WARN's contentions.

First, the fact that the savings are only guaranteed over the first five years does not diminish the benefit of the guaranteed savings to retail ratepayers.  Second, the fuel savings are a product of the merger.  As the Commission explained, the fuel cost savings "are the result of using the lower cost resources of each company to displace the higher cost resources of the other depending on the marginal cost of production of each utility's available resources in a given hour."  Without the merger, these savings from joint dispatch would not be possible.  Similarly, without the merger, it is unlikely the savings from the implementation of best practices for fuel procurement and use would be realized because companies do not usually share their proprietary skills and practices with unaffiliated entities.  Third, we are unconvinced that the savings to retail ratepayers will be diminished by settlements with wholesale customers.  As the Commission noted, there was testimony that "the settlement agreements between the Applicants and parties other than the Public Staff were considered by the Public Staff in its negotiations of its settlement with the Applicants."  Furthermore, the Commission ultimately sets retail

rates and the Commission is not bound by the terms of those settlement agreements.

In addition to the quantifiable fuel cost savings, the Commission also found that "substantial non-fuel O&M cost savings are expected to result from the integration of Duke and Progress over the long term." As explained by the Commission, this finding is supported by an internal study on merger integration savings and witness testimony that a major source of the O&M savings is lower payroll costs resulting from the elimination of duplicate positions.

Lastly, in addition to the fuel and non-fuel cost savings, the Stipulation provides that DEC and PEC will make annual community support and charitable contributions of at least $9.2 million and $7.28 million, respectively, in their service areas over four years and contribute $15 million for workforce development and low income energy assistance during the first year following the merger. Additionally, the merger order requires DEC and PEC to contribute $2 million to NC GreenPower.

Considering the significant guaranteed fuel cost savings and potential non-fuel cost savings, as well as the commitments by DEC and PEC to contribute funds to support the community, workforce development, and low income energy assistance, we hold

there was substantial evidence before the Commission that the merger will result in benefits to the public.

### 3. Public Convenience and Necessity

In NC WARN's third argument, NC WARN contends the merger is not justified by public convenience and necessity for three reasons: (1) the merger allows the applicants to manipulate prices and harm local markets; (2) the merger will result in job losses; and (3) the merger harms low income families. It is evident from the merger order that the Commission considered each of these concerns; nevertheless, the Commission found the merger justified by public convenience and necessity. Upon review, we affirm the Commission.

### Monopsony

NC WARN first argues the merger contradicts the public convenience and necessity because it is likely to create a monopsony, "a market situation in which one buyer controls the market." Black's Law Dictionary 1023 (7th ed. 1999). NC WARN contends this control could allow the buyer to manipulate prices, harming local markets, such as the market for renewable energy. NC WARN further contends that based on uncontroverted witness testimony concerning the potential for a monopsony following the merger, the Commission should have concluded "the

merger will harm [local markets] within North Carolina – such as renewable energy markets – and therefore the merger cannot be in the public convenience and necessity."

While we acknowledge the potential of a monopsony was raised in testimony provided during the Commission hearing, we find the Commission adequately addressed the issue in the merger order. In explaining the potential costs and risks of the merger enumerated in Finding of Fact 22, the Commission specifically addressed the testimony of Richard S. Hahn, noting "Hahn testified that a result of the merger would be market dominance by the merged entities with regard to the procurement of renewable energy, leading to unaffiliated renewable energy developers foregoing North Carolina development activities." Yet, after considering the rebuttal testimony of B. Mitchell Williams, the Commission was not persuaded that the merger would negatively impact the market for renewable energy. The Commission reasoned,

> PEC and DEC are required to meet their [Renewable Energy and Energy Efficiency Standards ("REPS")] renewable energy obligations in the least cost manner. In doing so, they minimize the rate impact to their customers of complying with this statutory mandate. In addition, to the extent the merger allows PEC and DEC to lower their REPS compliance costs through more efficient resource procurement

> procedures, this will be a direct benefit to
> their North Carolina customers.

The Commission further explained,

> following the close of the merger DEC and
> PEC will each continue to have the same
> obligations they had before the merger to
> refrain from favoring or subsidizing their
> affiliates, to pursue the most reliable,
> prudent and cost-effective resources and
> projects, and to demonstrate that they have
> done so in appropriate proceedings before
> the Commission[.]

Upon review, we hold the Commission's analysis is supported by Williams' testimony and the governing statutes, N.C. Gen. Stat. §§ 62-133.8(b) and 62-133.9(b).

## Job Losses

NC WARN also argues the merger contradicts the public convenience and necessity because it results in job losses. NC WARN specifically points to the testimony of James Rogers, William D. Johnson, and Paula Sims to emphasize the applicants' plan to terminate 2,000 or more jobs (approximately 6.7% of the applicants' workforce) as a consequence of the merger. NC WARN argues that "[t]hese job losses, in a time of economic crisis, weigh strongly against the merger of Duke and Progress."

We agree the job losses weigh against the public convenience and necessity; yet, the number of jobs lost must not be considered in isolation.

Although 2,000 or more jobs were expected to be lost as a result of the merger, the evidence before the Commission tended to show that a majority of these job reductions would occur through retirement, normal attrition, and voluntary severance. Furthermore, witness testimony reassured the Commission that these reductions would not affect the quality, safety, and reliability of DEC and PEC service because the majority of the reductions would occur in corporate functions, rather than operational functions. Testimony also provided that retained employees would benefit from the merger as a result of a larger, more diverse company with better career opportunities, compensation, and benefits.

It is evident from the merger order that the Commission considered the number of jobs lost, the manner in which the workforce was reduced, the benefits to the retained employees, and the potential benefits to retail ratepayers as a result of savings expected to be realized from lower payroll costs in its determination that the merger was justified by the public convenience and necessity. It is not this Court's role to second guess the determination of the Commission where its findings and conclusions are supported by the evidence.

Low-Income Families

In NC WARN's final argument, NC WARN argues the merger contradicts the public convenience and necessity because it harms low-income families. Specifically, NC WARN relies on the testimony of Roger D. Colton and contends the merger will eliminate the individualized customer service on which low-income families rely to manage the costs of electricity.

It is evident from the merger order that the Commission considered Colton's testimony but was unpersuaded. The Commission explained,

> [t]he Commission determines that the needs of low-income customers to manage their energy usage and be financially able to pay their bills are undeniably real and substantial, and the agencies and individuals who are committed to addressing those needs, particularly in times of economic hardship and high unemployment, have a considerable undertaking to manage. However, the Commission does not agree with witness Colton that the merger will adversely affect those customers or that conditions of the merger approval should be a major vehicle for addressing their energy needs.

The Commission was persuaded, however, "that the Applicants' commitments in the proposed Regulatory Conditions, along with the Commission's Rules and Regulations and monitoring by the Commission and the Public Staff, are sufficient to ensure that there is no diminution of resources to assist low-income customers and other customers of DEC and PEC."

Upon review of Williams' rebuttal testimony, we hold the Commission's analysis is supported by the evidence. In rebuttal, Williams testified that Colton's concerns were speculative and "that this merger will do absolutely nothing to impair or modify [the] Commission's jurisdiction, consumer protection authority or regulatory control over the combined company." Specifically, Williams identified numerous Commission Rules and Regulatory Conditions that ensure quality customer service. Williams further testified the merger would not affect the discretion of customer service representatives and would not constrain the range of options available to customer service representatives assisting low income families manage payments.

NC WARN further contends that the payment of $15 million dollars by DEC and PEC within the first year following the merger is inadequate to remedy the harm to low income families resulting from the merger. NC WARN instead asserts that the Commission should have required the applicants to pay $270 million, $27 million per year for 10 years, as recommended by Colton. We disagree.

As stated above, the Commission was clear that it did not agree with Colton's analysis. Although there is no direct evidence to link the $15 million payment to the harm to low-

income families, we hold the Commission did not err in approving the payment. As the Commission noted, the merger approval should not be the vehicle to address the energy needs of low income families. The statutory requirement for merger approval is that the merger is justified by the public convenience and necessity. Here, the $15 million dollar payment agreed to in the Stipulation is just a portion of the economic benefits to low income families, who also benefit from the $650 million in guaranteed savings to retail ratepayers.

Where it is evident that the Commission considered the potential costs and risks of the merger and weighed them against the anticipated benefits, and where there is substantial evidence supporting the Commission's findings and conclusions, we will not second guess the Commission's determination that the merger is justified by the public convenience and necessity. Thus, we affirm the Commission's approval of the merger in the merger order.

## C. Orangeburg's Appeal

Orangeburg, through its Department of Public Utilities, provides electric services to approximately 25,000 residential, industrial, and commercial customers in the City of Orangeburg and Orangeburg County. With a generation capacity of only 23.5

megawatts and a growing total peak load of over 180 megawatts, Orangeburg is reliant on wholesale purchases of power to meet the needs of its customers.

When the Commission entered the merger order, the Commission approved the application "subject to the provisions of [the merger order] and the Regulatory Conditions and Code of Conduct[.]" Just as Orangeburg argued before the Commission, Orangeburg, as "a potential wholesale power customer of Duke or Progress and a competitor for industrial load with utilities in the Southeastern United States[,]" challenges Regulatory Conditions 3.6, 3.7, and 3.9 on appeal.

In short, these Regulatory Conditions provide the following: (1) DEC and PEC "shall continue to serve [their] Retail Native Load Customers with the lowest-cost power it can reasonably generate or obtain . . . before making power available for sales to customers that are not entitled to the same level of priority[;]" (2) DEC and PEC shall give written notice to the Commission prior to "execut[ing] any contract that grants Native Load Priority to a wholesale customer" other than the historically served wholesale customers recognized by the Commission; and (3) "[t]he Commission retains the right to assign, allocate, impute, and make pro-forma adjustments with

respect to the revenues and costs associated with both DEC's or PEC's wholesale contracts for retail ratemaking and regulatory accounting and reporting purposes."

Orangeburg argues these Regulatory Conditions effectively restrict the sale of low cost wholesale power to certain Commission-favored wholesale customers in violation of the Commerce Clause and Supremacy Clause of the U.S. Constitution. As a result, Orangeburg, which is not one of the Commission-favored wholesale customers, contends it is competitively disadvantaged and will not receive competitive offers to purchase wholesale power in the future.

Below, the Commission considered these same arguments; nevertheless, the Commission approved the merger subject to the Regulatory Conditions finding,

> [t]he Commission-approved Regulatory Conditions effectively protect as much as reasonably possible the Commission's jurisdiction as a result of the merger, including risks related to agreements and transactions between and among DEC, PEC, and their affiliates, including the JDA; financing transactions involving Duke, DEC, or PEC, and any other affiliate; the ownership, use and disposition of assets by DEC or PEC; participation in the wholesale market by DEC or PEC; and filings with federal regulatory agencies. In addition they insulate DEC's and PEC's retail ratepayers as much as reasonably possible from any adverse consequences potentially

resulting from the merger.

In fact, in discussing the evidence and conclusions supporting the above finding, the Commission specifically addressed Orangeburg's challenges to Regulatory Conditions 3.6, 3.7, and 3.9, noting that "[t]he Commission, the North Carolina appellate courts[,] and FERC have been confronted by Orangeburg's arguments or by similar arguments by others on previous occasions." Following a discussion of these prior occasions, the Commission then explicitly rejected Orangeburg's challenges. "The Commission [further] determine[d] that Orangeburg lacks standing at this time and in these dockets to raise these issues and alternatively that Orangeburg's arguments as they contemplate potential future harm are not ripe for consideration."

Upon review, we agree with the Commission's analysis; yet, we do not reach the merits of Orangeburg's challenges to the Regulatory Conditions on appeal because we hold Orangeburg lacks standing to appeal the merger order. Therefore, we dismiss Orangeburg's appeal.

N.C. Gen. Stat. § 62-90 provides that a "party aggrieved" by a final Commission order or decision has standing to appeal. N.C. Gen. Stat. § 62-90(a) (2013). "Generally, 'a "party aggrieved" is one whose rights have been directly and

injuriously affected by the judgment entered[.]'" *State ex rel. Utilities Com'n v. Carolina Utility Customers Ass'n, Inc. (CUCA II)*, 163 N.C. App. 1, 10, 592 S.E.2d 277, 282 (2004) (quoting *Hoisington v. ZT-Winston-Salem Assocs.*, 133 N.C. App. 485, 496, 516 S.E.2d 176, 184 (1999) (citations omitted)). In this case, we hold Orangeburg is not a party aggrieved at this time.

In January 2011, Orangeburg entered into a wholesale power supply agreement with S.C. Electric & Gas Co. ("SCE&G") to purchase its power requirements from SCE&G from 1 January 2012 through at least 31 December 2022.[3] As a result of this agreement, Orangeburg is not currently in the market to purchase wholesale power from DEC or PEC and will not be until it reenters the market in search of a new agreement several years before the current agreement expires. Thus, Orangeburg is not aggrieved by the Regulatory Conditions it challenges. Furthermore, we find our holding is bolstered by Orangeburg's own declaration that it is merely "a potential wholesale power customer of Duke and Progress." As the Commission recognized, there are many variables subject to change prior to the time Orangeburg is back in the wholesale market.

---

[3]The wholesale power supply agreement between Orangeburg and SCE&G provided SCE&G an option to extend the agreement through 31 December 2023.

Despite its contract to purchase wholesale power from SCE&G through at least 31 December 2022, Orangeburg argues it has standing to challenge the regulatory conditions because the Commission, by allowing it to intervene, necessarily determined that it had an interest in the merger and a right to be heard. We are unpersuaded by Orangeburg's argument.

The standards for intervention and standing are discrete and distinguishable. Intervention in a Commission proceeding is governed by Commission Rule 1-19, which provides that "[a]ny person having an interest in the subject matter of any hearing . . . before the Commission may become a party thereto . . . by filing a verified petition with the Commission" that includes, among other requirements, "[a] clear, concise statement of the nature of the petitioner's interest in the subject matter of the proceeding, and the way and manner in which such interest is affected by the issues involved in the proceeding." N.C. Admin. Code. tit. 4, c. 11, r. 1-19(a) (June 2012). Rule 1-19 further provides:

> [L]eave to intervene filed within the time herein provided, in compliance with this rule and showing a real interest in the subject matter of the proceeding, will be granted as a matter of course, *but granting such leave does not constitute a finding by the Commission that such party will or may be affected by any order or rule made in the*

*proceeding.*

N.C. Admin. Code. tit. 4, c. 11, r. 1-19(d) (emphasis added). On the other hand, and as discussed above, standing is statutory and requires the party to be aggrieved. *See* N.C. Gen. Stat. § 62-90(a). As this Court has recognized, "[t]his Court's interpretation of 'party aggrieved' as it relates to an appeal of an order by the Commission . . . suggests that more than a generalized interest in the subject matter is required." *CUCA II*, 163 N.C. App. at 10, 592 S.E.2d at 282-83 (citing *State ex rel. Utilities Com'n v. Carolina Utility Customers Ass'n*, 104 N.C. App. 216, 408 S.E.2d 876 (1991) (holding CUCA was not an aggrieved party and dismissing its appeal of an order by the Commission for lack of standing because CUCA had failed to show that its interest in person, property, or employment has been substantially adversely affected, directly or indirectly); *State ex rel. Utilities Com'n v. Carolina Utility Customers Ass'n*, 142 N.C. App. 127, 136, 542 S.E.2d 247, 253 (2001) (holding that CUCA was not a "party aggrieved" and thus, lacked standing to appeal "because the Commission's order did not impact rates and because any rate increases [would] be effectuated at subsequent rates cases")).

Although Orangeburg may have had an interest in the proceedings before the Commission, Orangeburg is not currently

in the market to purchase wholesale power and, therefore, not directly and injuriously affected by the Regulatory Conditions approved by the Commission at this time. Thus, we hold Orangeburg is not an aggrieved party and dismiss its appeal for lack of standing. Additionally, although we dismiss Orangeburg's appeal for lack of standing, we take this opportunity to note, as did the Commission, that regulatory conditions similar to those challenged by Orangeburg have been upheld by the Commission, this Court, and FERC in prior cases. *See State ex. re. Utilities Com'n v. Carolina Power & Light Co.*, 359 N.C. 516, 614 S.E.2d 281 (2005).

## III. Conclusion

For the reasons discussed above, we hold the Commission did not err in determining the merger was justified by the public convenience and necessity and, therefore, affirm the Commission's approval of the merger. Furthermore, having determined Orangeburg lacks standing to raise a challenge to the regulatory conditions on appeal, we dismiss Orangeburg's appeal.

Affirmed in part and appeal dismissed in part.

Judges ELMORE and STEPHENS concur.