IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-32

No. COA20-867

Filed 18 January 2022

North Carolina Utilities Commission, No. EMP-105, SUB 0

STATE OF NORTH CAROLINA EX. REL. UTILITIES COMMISSION; PUBLIC
STAFF-NORTH CAROLINA UTILITIES COMMISSION, Appellees,
v.

FRIESIAN HOLDINGS, LLC, Petitioner; NORTH CAROLINA SUSTAINABLE
ENERGY ASSOCIATION, Intervenor; and NORTH CAROLINA CLEAN ENERGY
BUSINESS ALLIANCE, Intervenor, Appellants,
v.

DUKE ENERGY PROGRESS, LLC and NORTH CAROLINA ELECTRIC
MEMBERSHIP CORPORATION, Intervenors.

Appeal by Petitioner and Intervenor-Appellants from order entered 11 June

2020 by the North Carolina Utilities Commission. Heard in the Court of Appeals 21

September 2021.

*Fox Rothschild LLP, by Karen M. Kemerait, and Kilpatrick, Townsend &
Stockton LLP, by Steven J. Levitas, Benjamin L. Snowden, and Adam H.
Charnes, for Petitioner-Appellant.*

*Layla Cummings, Dianna W. Downey, and Robert B. Josey, Jr., for Appellee
Public Staff-North Carolina Utilities Commission.*

*Benjamin W. Smith and Peter H. Ledford for Intervenor-Appellant North
Carolina Sustainable Energy Association.*

*Adam Foodman and John D. Burns for Intervenor-Appellant North Carolina
Clean Energy Business Alliance.*

*Nexsen Pruet PLLC, by David P. Ferrell, and Richard M. Feathers and Michael D. Youth, for Intervenor-Appellee North Carolina Electric Membership Corporation.*

*Jack E. Jirak for Intervenor Duke Energy Progress, LLC.*

INMAN, Judge.

¶ 1     North Carolina has made significant strides in generating and employing alternatives to carbon-emitting fuels. We rank fourth in the nation in solar installations, with solar making up nearly eight percent of our state's electricity.[1] Our legislature has enacted clean energy goals including a 70 percent reduction in carbon emissions by the year 2030 and carbon neutrality by 2050.[2] The southeastern region of the state, in particular, has attracted several solar energy facilities.[3] But growing production has strained the region's existing electric grid. A dispute over the cost and timing of upgrading the grid gives rise to this appeal.

¶ 2     Unlike other industrial and commercial enterprises, energy generation

---

[1] Solar Energy Industries Association (SEIA), *State Solar Spotlight: North Carolina Solar*, (Sept. 24, 2021), https://www.seia.org/sites/default/files/2021-09/North Carolina.pdf.

[2] *See* An Act to Authorize the Utilities Commission, S.L. 2021-951, § 1, https://www.ncleg.gov/Sessions/2021/Bills/House/PDF/H951v5.pdf.

[3] In its order, the North Carolina Utilities Commission concluded, "[N]o party disputes that southeastern North Carolina exhibits many attributes favorable for the development of solar generating facilities and that those attributes have resulted in significant solar development in that region. As a result, however, the transmission infrastructure in that portion of the [Duke] system is approaching a tipping point where additional generation in certain portions of the system will require significant upgrades to the network."

facilities can operate only as permitted by the North Carolina Utilities Commission ("the Commission"). N.C. Gen. Stat. § 62-110.1(a) (2019). This system of regulation is analogous to state law limiting medical facilities to providers who have obtained a certificate of need from the Department of Health and Human Services. *See* N.C. Gen. Stat. § 131E-175(7) (2019). Energy plants cannot spring up like many restaurants, fitness centers, or dry cleaners, even if consumer demand would support the increased supply. In this way, government regulation influences the energy market.

¶ 3 Petitioner-Appellant Friesian Holdings, LLC ("Friesian"), an independent energy company, seeks to generate additional solar energy in the southeast. Friesian applied to the Commission for a certificate of public convenience and necessity ("CPCN" or "certificate") to build and operate a solar energy plant, which would sell and distribute electricity through an existing electric grid. Citing the cost of upgrading the region's electric grid to accommodate additional transmission, the Commission denied Friesian's application. Friesian appeals, contending that the Commission's decision unfairly favors larger energy utilities and squelches competition, to the detriment of consumers.

¶ 4 Friesian presents three arguments on appeal: (1) federal law aimed at fostering free competition preempts the Commission's decision; (2) the Commission's cost analysis was unsupported by the evidence and was arbitrary and capricious; and (3)

the Commission erred in concluding Friesian did not demonstrate a need for its facility. After careful review of the record and our precedent, we affirm the Commission.

## I.   FACTS & PROCEDURAL HISTORY

This appeal arises from Friesian's second application to the Commission to build and operate a solar energy plant. As explained below, Friesian's first application was successful, but Friesian amended its energy distribution plan, leading to the application process we now review.

On 9 September 2016, Friesian filed its first application with the Commission seeking a CPCN to construct a 70-MWAC solar photovoltaic electric generation facility ("the facility") in Scotland County. Pursuant to Commission Rule R8-64, Friesian classified itself as a small power producer or "qualifying facility," intending to sell the energy produced by its facility to the public utility Duke Energy Progress ("Duke") which owns and operates the energy grid servicing Scotland County. At the time of its application, Friesian had obtained most of the other federal and state permits required of them and planned to begin construction in early 2023 with commercial operation by December of the same year. The project did not generate any opposition from local residents or other interested parties. On 7 November 2016, the Commission granted Friesian a CPCN.

The Commission's policies for state generator interconnections assign directly

to the qualifying facility—also known as the "interconnection customer," here Friesian—the cost of upgrades to the grid necessary to connect to the qualifying facility. *See* Order Approving Revised Interconnection Standard, *In the Matter of Petition for Approval of Revisions to Generator Interconnection Standards*, State of North Carolina Utilities Commission, Docket No. E-100, Sub 101 (May 5, 2015).

¶ 8   On 2 August 2018, Friesian filed a request with the Commission to amend the CPCN previously issued for its facility to file as a different type of energy facility so that it could sell energy to a third-party energy distributor. Friesian's proposed facility would still have to interconnect with the electric grid owned and operated by Duke. Because the amount of electricity already transmitted through the grid is approaching its current maximum capacity, the grid must be upgraded to accommodate Friesian's additional energy supply.

¶ 9   On 15 May 2019, Friesian requested the Commission (1) allow Friesian to withdraw the requested amendment and (2) consider a *new* application for a CPCN as a "merchant plant" pursuant to Commission Rule R8-63 for the same facility. The Commission treated Friesian's filing as a request to *cancel* the previously issued CPCN. The Commission allowed withdrawal of the requested amendment, cancelled the previously issued CPCN, and closed the docket on 14 June 2019.

¶ 10   On 6 June 2019, Friesian and Duke entered into a large generator interconnection agreement defining the parties' respective obligations for

constructing and upgrading existing systems to accommodate the new facility. The necessary upgrade is estimated to require reconstruction of roughly 73 miles of the existing grid at a cost of $223.5 million plus $25 million in interest.[4] The interconnection agreement requires Friesian to bear sole responsibility for $100 million in estimated construction costs and another $4 million to interconnect the old and new facilities. However, a crediting policy provided by the Federal Energy Regulatory Commission ("FERC") to level the playing field between large public utility companies and independent energy producers requires Duke to reimburse Friesian for the upgrade costs, in full, by passing along those costs in higher rates charged to its wholesale and North Carolina retail customers.[5]

¶ 11        On 14 June 2019, eight days after entering into the agreement with Duke, Friesian executed a purchase power agreement ("PPA") with North Carolina Electric Membership Corporation ("NCEMC")[6] providing that Friesian would sell all the power and renewable energy credits generated by its facility to NCEMC. Duke would

---

[4] The Commission described these costs as "far and away [ ] the single costliest transmission project in North Carolina in recent times, perhaps the most expensive ever."

[5] These costs were calculated by Duke pursuant to the Open Access Transmission Tariff it filed with FERC.

[6] NCEMC is "one of the largest generation and transmission electric cooperatives in the nation, providing reliable, affordable electricity to its 25 member cooperatives. NCEMC owns power generation assets, purchases electricity through contracts, identifies innovative energy projects and coordinates transmission resources for its members." N.C. Electric Cooperatives, *Who We Are: About Us*, (last visited Oct. 28, 2021) https://www.ncelectriccooperatives.com/who-we-are/#about-us.

distribute the energy produced by the facility to NCEMC on a wholesale basis. FERC maintains jurisdiction over generating facilities' wholesale distribution rates. *See Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 374, 101 L. Ed. 2d 322, 340 (1988).

¶ 12 Friesian's arrangements with Duke and NCEMC changed the regulatory classification of its facility to a "merchant plant," so Friesian filed a second petition with the Commission for a CPCN as a "merchant plant." A "merchant plant" is "an electric generating facility . . . the output of which will be *sold exclusively at wholesale*[.]" Commission Rule R8-63(a)(2) (emphasis added). Duke, NCEMC, the North Carolina Sustainable Energy Association ("NCSEA"), and the North Carolina Clean Energy Business Alliance ("NCCEBA") petitioned to intervene in Friesian's certificate application proceeding. The Commission allowed those petitions. The Public Staff of the Commission ("Public Staff"), an independent agency charged with representing the interests of consumers,[7] also participated in the application process.

¶ 13 The Public Staff filed a motion asking the Commission to determine, among other legal questions:

> [w]hether the Commission has authority under state and federal law to consider as part of its review of the CPCN application the costs associated with the approximately

---

[7] By its own account, the "[Public Staff] is an independent agency not subject to the supervision, direction, or control of [the Commission]. The Public Staff represents the interests of the using and consuming public."

> $227 million dollars in transmission network upgrades and interconnection facilities necessary to accommodate the FERC-jurisdictional interconnection of the merchant generating facility, and the resulting impact of those network costs on retail rates in North Carolina[.]

Following briefing and arguments, the Commission entered an interlocutory order determining it could consider the upgrade costs pursuant to our General Statutes and its own rules. *See* § 62-110.1; Commission Rule R8-63.

¶ 14    In its second certificate application and before the Commission, Friesian presented evidence of potential benefits that could stem from its facility and the associated grid updates, including: (1) the interconnection of multiple gigawatts of new renewable generation in North Carolina and South Carolina; (2) expansion of the grid capacity so that other solar facilities in Duke's queue could be added in the future without additional upgrades; (3) the public would bear less of the upgrade costs compared to an alterative cost allocation under one of Duke's planned projects; and (4) additional solar energy generation would help bring Duke closer to its target clean energy goals.

¶ 15    The Public Staff challenged that evidence and argued against issuance of a CPCN. Witnesses for the Public Staff testified, and one of Friesian's witnesses conceded, that the facility would do little to supplement Duke's solar energy supply

during the peak winter season,[8] and that Duke had not previously identified the transmission lines in question as needing upgrades due to reliability issues.

¶ 16  On 11 June 2020, the Commission entered an order denying Friesian's application, based on extensive findings. The Commission concluded Friesian's generating facility project was not in the public convenience or need in part because the network upgrade costs, to be passed on to the ratepayers under FERC's crediting policy, were unreasonably high. Before its decision denying Friesian's application, the Commission had never before denied a CPCN to an energy generator that had entered into a PPA. Friesian timely appealed the Commission's order.

## II.  ANALYSIS

¶ 17  We review Utility Commission decisions to determine:

> if substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are
> (1) In violation of constitutional provisions, or
> (2) In excess of statutory authority or jurisdiction of the Commission, or
> (3) Made up on unlawful proceedings, or
> (4) Affected by other errors of law, or
> (5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or
> (6) Arbitrary or capricious.

---

[8] While Duke's energy resource plans demonstrate a need for additional capacity to meet the grid's winter peak loads, the addition of a solar facility, by its nature, could not provide the type of reliable or controlled additional power generation required during the winter season because of shorter days and less sunlight.

N.C. Gen. Stat. § 62-94(b) (2019). A decision by the Commission is arbitrary and capricious if it "lack[s] fair and careful consideration or fail[s] to display a reasoned judgment." *State ex rel. Utils. Comm'n v. Carolina Water Serv., Inc. of N.C.*, 225 N.C. App. 120, 130, 738 S.E.2d 187, 195 (2013).

¶ 18      On appeal, "any rule, regulation, finding, determination, or order made by the Commission . . . shall be prima facie just and reasonable." § 62-94(e). "[W]here there is substantial evidence supporting the Commission's findings and conclusions, we will not second guess the Commission's determination." *In re Duke Energy Corp.*, 232 N.C. App. 573, 586, 755 S.E.2d 382, 390 (2014). We review the Commission's conclusions of law *de novo*. *State ex rel. Utils. Comm'n v. Stein*, 375 N.C. 870, 900, 851 S.E.2d 237, 256 (2020). When the issue on appeal concerns interpreting a statute,

> the interpretation of a statute by an agency created to administer that statute is traditionally accorded some deference by appellate courts, [but] those interpretations are not binding. 'The weight of such [an interpretation] in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'

*In re N.C. Sav. & Loan League v. N.C. Credit Union Comm'n*, 302 N.C. 458, 466, 276 S.E.2d 404, 410 (1981) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 89 L. Ed. 124, 129 (1944)).

The Commission's CPCN standard "is a relative or elastic theory rather than an abstract or absolute rule. The facts in each case must be separately considered[.]" *State ex rel. N.C. Utils. Comm'n v. Casey*, 245 N.C. 297, 302, 96 S.E.2d 8, 12 (1957) (citations omitted).

### A. *The Commission's Decision Is Not Preempted by Federal Law*

Friesian contends the Commission's denial of its CPCN was preempted by federal law because the Commission based its decision, in large part, on the upgrade costs that would be charged to ratepayers as required by FERC's crediting policy. After careful review, we disagree.

Federal law may preempt state law or action in three distinct ways. First, Congress may expressly preempt state action through legislation. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203, 75 L. Ed. 2d. 752, 765 (1983). In the absence of express preemption, "the scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 91 L. Ed. 1447, 1459 (1947) (citations omitted). Third, state law or action is preempted where it directly conflicts with federal law, such that it makes compliance with both federal and state law impossible, or "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pac. Gas & Elec. Co.*, 461 U.S. at 204, 75 L. Ed. 2d at 765 (citations omitted). Friesian

asserts that the Commission's order is preempted because it stands in the way of FERC's policy of preventing discrimination by incumbent energy producers—like Duke—against smaller, independent producers seeking to enter the energy market.

¶ 22        The Federal Power Act ("FPA") assigns FERC exclusive jurisdiction over the transmission of energy in interstate commerce and over the rates for wholesale transactions.   16 U.S.C. § 824(b)(1) (2018); *see also State ex rel. Utils. Comm'n v. Carolina Power & Light Co.*, 161 N.C. App. 199, 203, 588 S.E.2d 77, 80 (2003), *rev'd on other grounds*, 359 N.C. 516, 614 S.E.2d 281 (2005).   FERC is responsible for ensuring that the rates charged by utilities within its jurisdiction are "just and reasonable."  § 824d(a); *see also Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 154, 194 L. Ed. 2d 414, 419 (2016).

¶ 23        On the other hand, the FPA "places beyond FERC's power, and leaves to the States alone, the regulation of 'any other sale'—most notably, any retail sale—of electricity."  *Hughes*, 578 U.S. at 154, 194 L. Ed. 2d at 420 (quoting *FERC v. Elec. Power Supply Assn.,* 577 U.S. 260, 265, 193 L.Ed.2d 661, 667 (2016) and § 824(b)). For example, state utilities commissions, rather than FERC, determine the level of consumer need for power and the siting of a necessary facility.  *Pac. Gas & Elec. Co.*, 461 U.S. at 205-06, 75 L. Ed. 2d at 766 ("Need for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States.").

¶ 24 Friesian's wholesale agreements with Duke and NCEMC trigger FERC jurisdiction over the interconnection of the systems. As noted above, the FPA provides: "All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of [FERC], and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable[.]" § 824d(a). FERC must remedy rates, charges, and other practices which are "unduly discriminatory or preferential." § 824e(a).

¶ 25 Pursuant to this authority, FERC issued the "Crediting Policy" in Order No. 2003 to establish standard procedures and pro forma agreements for the interconnection of generating facilities to transmission grids. Standardization of Generator Interconnection Agreements and Procedures, 68 Fed. Reg. 49,846 (Aug. 19, 2003) (codified at 18 C.F.R. 35). Order No. 2003 found that utilities owning or controlling transmission grids have strong incentives to preclude independent generators from accessing the grid and have engaged in discriminatory practices in the past. *Id.* ¶ 19. The crediting policy was intended to serve the following goals: (1) limit opportunities for transmission providers to favor their own generation; (2) facilitate market entry for generation competitors; (3) encourage "needed investment in generator and transmission infrastructure;" (4) ensure interconnection customers' interconnections are treated comparably to the interconnections that a non-

independent transmission provider makes with its own generating facilities; and (5) "enhance competition in bulk power markets by promoting the construction of new generation, particularly in areas where entry barriers due to unduly discriminatory transmission practices may still be significant." *Id*. ¶¶ 12, 694.

¶ 26 Our General Statutes provide:

> [N]o public utility or other person shall begin the construction of any steam, water, or other facility for the generation of electricity to be directly or indirectly used for the furnishing of public utility service . . . without first obtaining from the Commission a certificate that public convenience and necessity requires, or will require, such construction.

§ 62-110.1(a). Along with concerns like benefit to the public and the life of the facilities, the Commission may also consider the total costs of construction including those to construct the generating facility, to interconnect facilities, and to upgrade the existing network. § 62-110.1(e); Commission Rule R8-63.

¶ 27 Because the Commission has the sole authority to determine the need for new energy generation in North Carolina pursuant to Section 62-110.1, a power reserved for the states by Congress under the FPA, we hold the Commission's decision to deny Friesian's CPCN is not preempted by federal law. *See State ex rel. Utils. Comm'n v. Carolina Power & Light Co.*, 359 N.C. 516, 529, 614 S.E.2d 281, 289 (2005) (holding the Commission's decision was not preempted because the Commission "[wa]s not claiming . . . the authority to overrule or second-guess an agreement filed with or

approved by FERC and subject to FERC's jurisdiction" and it was not "attempting to set rates in a wholesale agreement"). Further, our review of the record reveals that the Commission's decision to deny Friesian's application does not "stand[ ] as an obstacle" to FERC's crediting policy goals. *See Pac. Gas & Elec. Co.*, 461 U.S. at 204, 75 L. Ed. 2d. at 765 (outlining that state law is preempted by federal law when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress") (citations omitted)). Friesian has failed to cite, and we cannot find, any precedent precluding a state from considering the cost of required network upgrades in a siting determination.

¶ 28     The United States Supreme Court has made clear that states may not interfere with FERC-regulated interstate wholesale rates. *See Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966, 90 L. Ed. 2d 943, 954 (1986) ("Once FERC sets such a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable. A State must rather give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority."); *Miss. Power & Light Co.*, 487 U.S. at 374, 101 L. Ed. 2d at 340 ("Congress has drawn a bright line between state and federal authority in the setting of wholesale rates and in the regulation of agreements that affect wholesale rates. States may not regulate in areas where FERC has properly exercised its jurisdiction to determine just and reasonable wholesale rates

or to insure that agreements affecting wholesale rates are reasonable."). Yet nothing in the FPA precludes states from considering the cost of network upgrades in the preliminary determination of the most cost-effective location for a generating facility or whether energy generation is in the public convenience and need for its residents.

¶ 29 In this case, FERC has not yet allocated costs related to energy to be generated by Friesian's proposed facility. FERC has no authority to order, directly or otherwise, that Friesian's facility be constructed, that it be sited in a particular part of the state, or that its energy be sold to a certain purchaser. The Commission is empowered to make the siting decision of whether and where an energy generating facility can be constructed. FERC then has control over wholesale rates. The Commission's authority to make siting decisions is unaffected by FERC's jurisdiction. Surely, the Commission would be preempted from attempting to alter the cost allocation set by FERC after it approved a site and after parties had incurred costs. But that was not the sequence of events in this case.

¶ 30 We agree with Friesian that if Duke itself generates additional energy in the southeast that requires upgrading the grid, the Commission could not prohibit Duke from passing 100 percent of grid update costs to its ratepayers pursuant to FERC's crediting policy, costing consumers more than if they purchased energy generated by Friesian. *See Nantahala Power & Light Co.*, 476 U.S. at 964-67, 970, 90 L. Ed. 2d at 952-55, 957. However, the Commission's order reflects that it did not deny Friesian's

second application merely because upgrade costs would be passed along to the public. Instead, the Commission compared the unprecedented magnitude of upgrade costs to be borne by ratepayers to accommodate Friesian's proposed facility with the facility's expected output, and concluded they were too burdensome to be in the public convenience. So, we hold that in denying Friesian's application, the Commission did not usurp or alter FERC's crediting policy.

¶ 31        We acknowledge, as Friesian asserts, that the interconnection and upgrade process is ripe for discrimination by incumbents like Duke because of the economic incentive to favor its own generating facilities and disadvantage independent power producers. However, Friesian's generating plant was not the target of FERC's crediting policy in this circumstance and the Commission's denial of Friesian's application does not threaten FERC's comprehensive federal regulatory scheme. *See Pac. Gas & Elec. Co.*, 461 U.S. at 204, 75 L. Ed. 2d. at 765. *Cf. Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 964 F.3d 1177, 1188 (D.C. Cir. 2020) ("A State's regulations aimed directly at matters in FERC's jurisdiction cannot be sustained when they threaten the achievement of the comprehensive scheme of federal regulation.") (cleaned up)). That is because Friesian's entry into the energy market did not depend upon FERC's crediting policy.

¶ 32        Friesian was already a participant in the energy market, prepared to pay construction and upgrade costs as a qualifying facility. It then sought to take

advantage of the cost allocation required under FERC's crediting policy by contracting with NCEMC. Under this arrangement, Duke would distribute the energy generated by Friesian's facility wholesale to NCEMC. As a result of the wholesale contract, Friesian re-classified itself as a merchant plant with the Commission. Absent this change in classification, Friesian already had a CPCN in hand and was permitted to build and operate its facility. For this reason, we conclude the Commission's denial of Friesian's second application does not frustrate FERC's policy goal to prevent discrimination in competition by an incumbent against a new provider.

¶ 33 We hold federal law does not preempt the Commission's denial of Friesian's application because it did not "interfere with FERC's authority by *disregarding* interstate wholesale rates." *Hughes*, 578 U.S. at 165, 194 L. Ed. 2d at 427 (emphasis added).

### B. The Commission's Cost Analysis

¶ 34 Second, Friesian argues the Commission's denial of its CPCN was arbitrary and capricious and unsupported by substantial evidence because the Commission did not consider "additional generation resources that the upgrades would facilitate."

¶ 35 As part of its need determination, the Commission adopted the levelized cost of transmission ("LCOT") test to evaluate "the reasonableness of the network upgrade

costs associated with interconnecting a new generating facility."[9] The LCOT is "calculated by dividing the annualized cost of the required new transmission assets over the typical transmission asset lifetime by the expected annual generator output in [megawatt hour]."

¶ 36    At the hearing on its application, Friesian introduced evidence that the network upgrades would "facilitate the interconnection of 1,500 megawatts of additional generation in the Carolinas." Duke introduced evidence that the network upgrades would allow for greater interconnection in its southeastern service territory, alleviate any "queue paralysis" and delays in future interconnection, and minimize challenges in its own interconnection study process.

¶ 37    In its cost analysis, the Commission accounted only for the planned output from Friesian's facility, not the potential output from future electricity generation by other facilities that would use the upgraded grid. Based on the narrowed consideration, Friesian's upgrades were assigned an LCOT value of $62.94 per megawatt hour ("MWh") as opposed to between $1.56/MWh and $3.22/MWh for comparable nationwide solar network upgrades. Friesian's LCOT value was significantly higher than the LCOT values for two other generators in the state, both

---

[9] We note that Friesian challenged the propriety of this test before the Commission but "would accept an appropriate LCOT test for the purpose of evaluating the public convenience of the Friesian Facility in light of the Network Upgrade costs."

of which have received CPCNs from the Commission, at $0.33/MWh and $0.92/MWh.

¶ 38        Friesian asserts that if the Commission had weighed the potential future electricity generation created by the network upgrades, its upgrade figures would be much more comparable to benchmark LCOT numbers. But the record reflects that the Commission did, in fact, carefully consider and weigh the potential for additional energy generation. Rather than disregard that consideration outright, the Commission determined it was too speculative to support the approval of Friesian's CPCN. The Commission explained that the LCOT analysis provides a benchmark of reasonableness of the upgrades relative to other similar transmission investments, but it is not a determinative test upon which the Commission could solely base its CPCN decision. In its discretion, the Commission concluded that the potential additional generation was subject to many variables and "there is nothing in the record to conclude that any of the proposed generating facilities, much less all of them, will actually be constructed and placed into service." Friesian cites no authority supporting its argument that the Commission was required to consider potential future generation. Nor does Friesian offer any reason for this Court to deviate from the deferential standard of review applicable to any discretionary decision by the Commission. *See* § 62-94(e) ("[A] rule, regulation, finding, determination, or order made by the Commission . . . shall be prima facie just and reasonable."); *N.C. Sav. & Loan League*, 302 N.C. at 466, 276 S.E.2d at 410 ("[T]he

interpretation of a statute by an agency created to administer that statute is traditionally accorded some deference by appellate courts[.]").

¶ 39        Considering the record and the Commission's exercise of its discretion in a fact-specific analysis, we cannot conclude the Commission's cost calculation was arbitrary and capricious, lacked "fair and careful consideration," or "failed to display reasoned judgment." *State ex rel. Utils. Comm'n*, 225 N.C. App. at 130, 738 S.E.2d at 194.

¶ 40        NCSEA and NCCEBA, as intervenors, further contend that the Commission could not implement this LCOT analysis for the first time in its consideration of Friesian's application without conducting rulemaking procedures including public notice and request for public comment. The LCOT analysis is not mandated by statute or Commission Rule for a CPCN application. *See* § 62-110.1; Commission R8-63. However, NCSEA and NCCEBA concede that the Commission is exempt from North Carolina's Administrative Procedures Act, N.C. Gen. Stat. § 150B-1(c)(3) (2019), so formal notice-and-comment rulemaking requirements do not generally apply to Commission policies. These intervenors have not cited, and we have not found, authority prohibiting the Commission from employing the LCOT analysis to the CPCN application process absent a rulemaking procedure.

¶ 41        For these reasons, we hold the Commission did not err by employing the LCOT analysis in its need determination.

### C. *The Commission Did Not Err in Concluding Friesian Did Not Demonstrate Public Need*

¶ 42    Friesian contends the Commission's conclusion that Friesian failed to demonstrate a need for the solar electric plant was arbitrary and capricious because Friesian presented evidence of an executed PPA with NCEMC and the Commission has never before denied a certificate application where a PPA existed to demonstrate need. Friesian also asserts that the Commission inappropriately imposed the more stringent need standard for public utilities when it considered Friesian's application as a merchant plant.

¶ 43    There is no indication in the record that the Commission applied the wrong need standard. The Commission considered Friesian's application as a merchant plant pursuant to R8-63, applying the correlating need requirement for that facility classification. *Compare* Commission Rule R8-61(b) (public utilities) *with* Commission Rule R8-63(b)(3) (merchant plants).

¶ 44    In 1992, the Commission established a rule (the "Empire Power Requirement," Docket No. SP-91, Sub 0), requiring a written output contract to demonstrate need for a facility. However, in 2001, the Commission adopted Rule R8-63(b)(3) (No. E-100, Sub 85), requiring that a merchant plant applying for a CPCN provide a "description of the need for the facility in the state and/or region, with supporting documentation." In adopting the current rule, the Commission expressly overruled

its "Empire Power Requirement" that an applicant must submit a written contract for purchase of energy. Friesian contends that because it met the original, more stringent requirement to demonstrate need, it necessarily established need for its facility in this case.

¶ 45 We do not agree that the original requirement was necessarily more stringent than the current requirement. Rather, under the Commission's current rule, the presence or absence of an existing contract is simply not dispositive of the need for a facility. Our General Statutes provide that before the Commission can award a CPCN it must consider the "applicant's arrangement with other electric utilities for exchange of power, pooling of plant, purchase of power and other methods for providing reliable, efficient, and economical electric service." § 62-110.1(d). By its own rules, the Commission may consider other factors in its need determination, including compliance with state or federal laws.[10] That the Commission has yet to

---

[10] *See* Order Granting Certificate and Accepting Registration of New Renewable Facility, *In the Matter of Application of Atlantic Wind, LLC, for a Certificate of Public Convenience and Necessity Construct a 300-Megawatt Wind Facility in Pasquotank and Perquimans Counties and Registration as a New Renewable Energy Facility*, State of North Carolina Utilities Commission, Docket No. EMP-49, Sub 0 (May 3, 2011); Order Issuing Certificate of Public Convenience and Necessity with Conditions, *In the Matter of Application of Duke Energy Carolinas, LLC, for a Certificate of Public Convenience and Necessity to Construct a 402-MW Natural Gas-Fired Combustion Turbine Generating Facility in Lincoln County, North Carolina*, State of North Carolina Utilities Commission, Docket No. E-7, Sub 1134 (Dec. 7, 2017); Order Granting Certificate with Conditions*, In the Matter of Application of Duke Energy Progress, LLC, for a Certificate of Public Convenience and Necessity to Construct a Microgrid Solar and Battery Storage Facility in Haywood County, North*

deny an application supported by an executed PPA makes this a case of first impression, but it does not establish an outright prohibition.

¶ 46        Here, relying on its past orders, the Commission applied the correct merchant plant need standard, affording "some weight to the existence of the PPA as a demonstration of need." However, it agreed with the Public Staff that while the PPA demonstrates potential financial or economic viability of the project, "it is not in and of itself a sufficient criterion on which to base a recommendation for approval or disapproval of a CPCN."

¶ 47        The record reveals the Commission considered and weighed the benefits of Friesian's contract with NCEMC and Duke. Nonetheless, the Commission concluded the project was not in the public interest: "the cost of the Network Upgrades dwarfs the costs of the generating plant" and "the scale of the costs associated with the Facility relative to the size and projected revenue from the Facility raises concerns regarding economic viability of the project." While reasonable minds may disagree about the Commission's judgment call, the applicable standard of review does not afford this Court the authority to "second guess the Commission's determination" in this regard. *In re Duke Energy Corp.*, 232 N.C. App. at 586, 755 S.E.2d at 390.

¶ 48        NCEMC argues, in the alternative to its request for reversal, that we remand

---

*Carolina*, State of North Carolina Utilities Commission, Docket No. E-2, Sub 1127 (Apr. 6, 2017).

this matter to the Commission with instructions that it consider developments which might have occurred with the passage of time since its denial of Friesian's application or that might occur in the service life of Friesian's facility, such as the completion of Duke's integrated resource plan, proposed queue reform, and additional generating capacity. Our review is limited to whether substantial evidence in the record before us supports the Commission's decision, *see* § 62-94(b)(5), so we cannot consider later occurring developments.

## III. CONCLUSION

For the above reasons, we affirm the order of the Commission.

AFFIRMED.

Judge HAMPSON concurs.

Judge MURPHY concurs by separate opinion.

MURPHY, Judge, concurring in result only.

Based merely upon the arguments made by Petitioner-Appellant and Intervenor-Appellant, I agree with the Majority's analysis. While I have surmised potential winning arguments for Appellants, such arguments were not made by them and have not been made a part of this adversarial proceeding. This case does not present an issue of statutory interpretation that would necessitate our deviation from the basic tenet that "it is not the role of this Court to create an appeal for an appellant or to supplement an appellant's brief with legal authority or arguments not contained therein." *Thompson v. Bass*, 261 N.C. App. 285, 292, 819 S.E.2d 621, 627 (2018); *disc. rev. denied*, 822 S.E.2d 617 (2019); *Wells Fargo Bank, N.A. v. Am. Nat'l Bank & Tr. Co.*, 250 N.C. App. 280, 286, 791 S.E.2d 906, 911 (2016) ("When this Court is called upon to interpret a statute, we must examine the text, consult the canons of statutory construction, and consider any relevant legislative history, regardless of whether the parties adequately referenced these sources of statutory construction in their briefs. To do otherwise would permit the parties, through omission in their briefs, to steer our interpretation of the law in violation of the axiomatic rule that while litigants can stipulate to the facts in a case, no party can stipulate to what the law is. That is for the court to decide."). As a result, I would not consider our opinion today to foreclose future litigants from making additional or refined arguments on the issues presented by this case and concur in result only.